# Nos. 22-11853-D, 23-12915-D

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff/Appellee,*

v.

RAOUL DOEKHIE, SHERIDA NABI, and JOHNNY GROBMAN,
*Defendant/Appellants*.

On Appeal from the United States District Court for
the Southern District of Florida

## APPELLANTS' JOINT MOTION FOR LEAVE TO FILE A JOINT OPENING BRIEF EXCEEDING THE WORD LIMIT

HOWARD SREBNICK
BLACK SREBNICK P.A.
201 S. Biscayne Blvd. Suite 1300
Miami, Florida 33131
Tel. No. (305) 371-6421
*Counsel for Appellant Doekhie*

DAVID OSCAR MARKUS
MARKUS/MOSS PLLC
40 N.W. 3rd Street, PH1
Miami, Florida 33128
Tel. No. (305) 379-6667
*Counsel for Appellant Grobman*

RICHARD C. KLUGH
RICHARD C. KLUGH, P.A.
40 NW Third Street, PH 1
Miami, Florida 33128
Tel. No. (305) 536-1191
*Counsel for Appellant Nabi*

**APPELLANTS' JOINT MOTION FOR LEAVE TO FILE A JOINT OPENING BRIEF EXCEEDING THE WORD LIMIT**

Appellants, through undersigned counsel, respectfully move for leave to file a single joint opening brief exceeding the applicable 13,000-word limit by 5,060 words, for a total of 18,060 words. In support, Appellants state as follows:

1. Appellants' opening briefs are due on October 2, 2026. Rather than filing three separate briefs of up to 13,000 words each, for a combined total of 39,000 words, Appellants seek leave to file a single joint opening brief of 18,098 words.

2. This approach will substantially reduce the overall briefing and promote judicial economy. Although the proposed joint brief exceeds the ordinary 13,000-word limit, it is significantly shorter than the combined 39,000 words Appellants could submit through three separate briefs. Allowing a single joint brief will eliminate unnecessary duplication, streamline the presentation of the issues, and conserve the resources of both the Court and the parties.

3. Good cause exists for the requested relief. This appeal arises from a lengthy trial involving complex factual and legal issues concerning convictions for wire fraud, theft, money laundering, and related offenses. Appellants raise numerous issues on appeal, but those issues substantially overlap and arise from the same trial record. A single, comprehensive brief will allow Appellants to present their shared

arguments in a coherent and organized manner, without repeating the same facts, legal authorities, and arguments across three separate briefs.

4. The requested enlargement is therefore modest when considered in the context of the three Appellants and the substantial reduction in total briefing it will achieve. Permitting the joint brief will facilitate, rather than burden, the Court's consideration of this appeal.

5. Counsel for Appellants have conferred with counsel for the Government, who advised that the Government takes no position on this motion.

6. Appellants are submitting their proposed joint opening brief as an attachment to this motion so that the Court may review the brief in its entirety when considering the requested relief.

WHEREFORE, Appellants respectfully request that the Court grant this unopposed motion, authorize the filing of a single joint opening brief of up to 18,098 words, and accept the attached proposed joint opening brief for filing.

Respectfully submitted,

/s/ Howard Srebnick
HOWARD SREBNICK, ESQ.
BLACK SREBNICK P.A.
201 S. Biscayne Blvd. Suite 1300
Miami, Florida 33131
Tel. No. (305) 371-6421
*Counsel for Appellant Doekhie*

/s/ David Oscar Markus
DAVID OSCAR MARKUS, ESQ.
MARKUS/MOSS PLLC
40 N.W. 3rd Street, PH1
Miami, Florida 33128
Tel. No. (305) 379-6667
*Counsel for Appellant Grobman*

/s/ Richard C. Klugh
RICHARD C. KLUGH, ESQ.
RICHARD C. KLUGH, P.A.
40 NW Third Street, PH 1
Miami, Florida 33128
Tel. No. (305) 536-1191
*Counsel for Appellant Nabi*

**CERTIFICATE OF COMPLIANCE**

I CERTIFY that this motion complies with the type-volume limitation of FED. R. APP. P. 32(a)(7). According to the WordPerfect program on which it is written, the numbered pages of this motion contains 367 words.

By: /s/ David Oscar Markus
David Oscar Markus

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that the foregoing was electronically filed on this 2nd day of October 2026 and served on that date by ECF filing upon all counsel of record.

By: /s/ David Oscar Markus
David Oscar Markus

# Nos. 22-11853-D, 23-12915-D

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff/Appellee,*

v.

RAOUL DOEKHIE, SHERIDA NABI, and JOHNNY GROBMAN,
*Defendant/Appellants*.

On Appeal from the United States District Court for
the Southern District of Florida

**APPELLANTS' JOINT INITIAL BRIEF**

HOWARD SREBNICK
BLACK SREBNICK P.A.
201 S. Biscayne Blvd. Suite 1300
Miami, Florida 33131
Tel. No. (305) 371-6421
*Counsel for Appellant Doekhie*

DAVID OSCAR MARKUS
MARKUS/MOSS PLLC
40 N.W. 3rd Street, PH1
Miami, Florida 33128
Tel. No. (305) 379-6667
*Counsel for Appellant Grobman*

RICHARD C. KLUGH
RICHARD C. KLUGH, P.A.
40 NW Third Street, PH 1
Miami, Florida 33128
Tel. No. (305) 536-1191
*Counsel for Appellant Nabi*

## TABLE OF CONTENTS


TABLE OF CITATIONS .......... v

STATEMENT REGARDING ORAL ARGUMENT .......... 1

STATEMENT OF JURISDICTION .......... 1

STATEMENT OF THE ISSUES .......... 2

STATEMENT OF THE CASE .......... 4

Introduction .......... 4

Statement of Facts, Course of Proceedings, and Disposition in the District Court .......... 9

I. The charges: four alleged "victim" companies with varying contractual requirements .......... 12

A. The contracts sometimes did not contain restrictions related to diversion, or sale of additional product provided the needs of the intended market were satisfied—and when they did, such restrictions were not material .......... 13

i. Eden – No written agreement, just Account application and purchase orders .......... 13

ii. Alcon – Exclusivity clause was not material to the contract and did not address sales outside the intended territory .......... 14

iii. Domino – No evidence of any written restriction on resale of products in the United States .......... 14

iv. Mead Johnson – No written agreement prior to 2015; subsequent exclusivity clause was not material because Suriname market needs were being met ....16

B. The evidence showed that Tropical's orders were consistent with manufacturers' own sales forecasts and business interests ....17

C. Tropical fulfilled the heart of the bargain: The products were delivered to Suriname and put to use ....19

II. The district court's evidentiary rulings ....20

III. The charge to the jury ....22

IV. The Rule 29 proceedings ....23

V. Forfeiture and Sentencing ....25

STANDARDS OF REVIEW ....27

SUMMARY OF THE ARGUMENT ....28

ARGUMENT AND CITATIONS OF AUTHORITY ....34

I. The wire fraud convictions must be vacated because the Government failed to prove the materiality of any misrepresentation....34

A. The Government failed to prove any materially false representation with respect to Eden, and failed to prove any criminal conspiracy to defraud Eden (Counts 1 and 2) ....42

B. Mead's own witness confessed the absence of materiality, warranting vacatur on Counts 1, 3, 4, 6, and 7 .......... 45

C. Alcon's witness similarly testified that halting sales would have been contrary to manufacturer aims, warranting vacatur on Counts 1, 8, and 9 .......... 47

D. The Government failed to prove an applicable contractual clause with respect to Domino, much less a material one .......... 49

II. The district court denied Appellants a fair determination of materiality by instructing the jury, and permitting the Government to argue, that the manufacturers' conduct was irrelevant, and by restricting the defense from making arguments related to company conduct in closing .......... 51

III. Counts 2, 5, 8, and 9 must be vacated because the charged transmissions were not in furtherance of any fraud scheme but instead occurred after the relevant sales or after discovery of the alleged diversion .......... 57

IV. The pre-retail theft convictions must be vacated where the manufacturers voluntarily transferred the infant formula for the full agreed-upon purchase price and the Government proved, at most, misrepresentations affecting the price of otherwise voluntary sales rather than that Appellants "obtained" the medical products themselves "by fraud or deception" .......... 64

V. The smuggling convictions under 18 U.S.C. § 554 must be vacated where the goods were lawful to export, the charged export information was accurate when submitted by third parties, and the Government's theory depended on later conduct retroactively transforming truthful Automated Export System filings into knowingly false or misleading export information .......... 67

VI. The money laundering convictions must be vacated because the Government failed to prove criminally derived proceeds ................... 70

VII. The district court erred at sentencing, warranting reversal and remand ........................................................................................ 72

A. The district court erred in calculating loss for purposes of sentencing ........................................................................ 72

B. The district court's Keene finding was invalid, rendering sentencing error not harmless ................................................ 76

C. Based on the district court's errors in calculating loss, resentencing relief is warranted as to the restitution judgment ........................................................................ 78

CONCLUSION ........................................................................................ 79

CERTIFICATE OF COMPLIANCE ........................................................ 80

CERTIFICATE OF SERVICE ................................................................ 80

## TABLE OF CITATIONS

**CASES:**

*Burks v. United States*, 437 U.S. 1 (1978) ............................................................33

*Ciminelli v. United States*, 598 U.S. 306 (2023).....................................................37

*Dubin v. United States*, 599 U.S. 110 (2023) ....................................................36, 65

*Fidelity Interior Construction v. Se. Carpenters Reg'l Council of United Broth. of Carpenters & Joiners of Am.*, 675 F.3d 1250 (11th Cir. 2012) .....................................................................27

*Francis v. Franklin*, 471 U.S. 307 (1985) ............................................................53

*Gall v. United States*, 552 U.S. 38 (2007) ............................................................77

*Griffin v. United States*, 502 U.S. 46 (1991).....................................................34, 71

*Grunewald v. United States*, 353 U.S. 391 (1957) ..........................................59, 63

*Kann v. United States*, 323 U.S. 88 (1944)..........................................................58

*Klay v. United Healthgroup, Inc.*, 376 F.3d 1092 (11th Cir. 2004) ........................27

*Kousisis v. United States*, 605 U.S. 114 (2025).............. 1, 30, 34-38, 41, 51, 54, 56

*Liparota v. United States*, 471 U.S. 419 (1985) ....................................................69

*Long v. Raymond Corp.*, 245 Fed. Appx. 912 (11th Cir. 2007) .............................27

*Rehaif v. United States*, 588 U.S. 225 (2019) .......................................................70

*Schmuck v. United States*, 489 U.S. 705 (1989) ...............................................59, 60

*Universal Health Services, Inc. v. United States ex rel. Escobar* 579 U.S. 176 (2016)........................................ 1, 29, 30, 35-38, 47, 48, 51, 56

*United States v. Adkinson*, 158 F.3d 1147 (11th Cir. 1998) ....................................34

*United States v. Bass*, 404 U.S. 336 (1971) ..........................................................69

*United States v. Browne*, 505 F.3d 1229 (11th Cir. 2007)......................................28

*United States v. Bruchhausen*, 977 F.2d 464 (9th Cir. 1992).................................26

*United States v. Campa*, 459 F.3d 1121 (11th Cir. 2006) ......................................27

*United States v. Carrasco*, 381 F.3d 1237 (11th Cir. 2004)...................................27

*United States v. Christo*, 129 F.3d 578 (11th Cir. 1997).........................................59

*United States v. Diamond*, 102 F.4th 1347 (11th Cir. 2024)...................................27

*United States v. Dohan*, 508 F.3d 989 (11th Cir. 2007) ..........................................28

*United States v. Frazier*, 387 F.3d 1244 (11th Cir. 2004).......................................27

*United States v. Gaudin*, 515 U.S. 506 (1995) ......................................................52

*United States v. Goldman*, 953 F.3d 1213 (11th Cir. 2020)....................................76

*United States v. Hasson*, 333 F.3d 1264 (11th Cir. 2003).......................................28

*United States v. Huff*, 609 F.3d 1240 (11th Cir. 2010)............................................79

*United States v. Izurieta*, 710 F.3d 1176 (11th Cir. 2013).......................................70

*United States v. Javat*, 2026 WL 1224100 (11th Cir. May 5, 2026)............ 7, 73-75

*United States v. Keene*, 470 F.3d 1347 (11th Cir. 2006)................26, 27, 33, 76, 78

*United States v. Kelly*, 888 F.2d 732 (11th Cir. 1989)............................................34

*United States v. Kilkenny*, 493 F.3d 122 (2d Cir. 2007).........................................63

*United States v. Lane*, 474 U.S. 438 (1986) ....................59

*United States v. Liss*, 265 F.3d 1220 (11th Cir. 2001)....................73

*United States v. Martin*, 803 F.3d 581 (11th Cir. 2015)....................28

*United States v. McCarrick*, 294 F.3d 1286 (11th Cir. 2002) ....................43

*United States v. Moran*, 778 F.3d 942 (11th Cir. 2015) ....................27

*United States v. Morilla,* 177 F.4th 1291 (11th Cir. 2026)....................76, 77

*United States v. Redcorn*, 528 F.3d 727 (10th Cir. 2008) ....................59

*United States v. Robertson*, 493 F.3d 1322 (11th Cir. 2007)....................73

*United States v. Ross*, 131 F.3d 970 (11th Cir. 1997) ....................58

*United States v. Rothenberg*, 610 F.3d 621 (11th Cir. 2010) ....................28

*United States v. Santos*, 553 U.S. 507 (2008)....................69

*United States v. Villegas,* 911 F.2d 623 (11th Cir. 1990)....................34

*Wooden v. United States*, 595 U.S. 360 (2022) ....................32

*Yates v. United States,* 354 U.S. 298 (1957)....................33, 34, 71

**STATUTORY AND OTHER AUTHORITY**

U.S.S.G. § 2B1.1....................26, 75

U.S.S.G. § 2B1.1(b)(2) ....................26

15 C.F.R. § 30.71 ....................32, 68

18 U.S.C. § 545....................70

18 U.S.C. § 554 ....................3, 10, 32, 67, 68, 71

18 U.S.C. § 670 ....................3, 31, 57, 64, 66

18 U.S.C. § 670(a)(6)....................10

18 U.S.C. § 670(a)(1)....................10

18 U.S.C. § 981(a)(2)....................25

18 U.S.C. § 3231 ....................1

18 U.S.C. §1343 ....................10, 59, 60

18 U.S.C. § 1349 ....................10

18 U.S.C. § 1957 ....................10, 71, 72

18 U.S.C. § 3553(a) ....................8, 27, 77

18 U.S.C. § 3664(e) ....................78

18 U.S.C. § 3742(a) ....................1

28 U.S.C. § 1291 ....................1

*The Adventure,* 1 F. Cas. 202, 204 (No. 93) (CC Va. 1812) (Marshall, C.J.) .........32

The Mandatory Victims Restitution Act (MVRA) of 1996....................78

## STATEMENT REGARDING ORAL ARGUMENT

Appellants respectfully submit that oral argument is warranted because this appeal presents important and record-intensive questions concerning materiality in a criminal fraud prosecution. In particular, the Court will be called upon to determine whether manufacturers who set their own prices, were paid in full, received the performance they wanted, and in some instances continued selling after learning of diverted products, were deprived of anything material to their bargains. This appeal further presents the related question whether the jury was improperly told to disregard such evidence. Oral argument would materially assist the Court in applying *Kousisis v. United States*, 605 U.S. 114 (2025), and *Universal Health Services, Inc. v. United States ex rel. Escobar*, 579 U.S. 176 (2016), to this extensive record.

## STATEMENT OF JURISDICTION

The district court had jurisdiction of this case pursuant to 18 U.S.C. § 3231, because the defendants were charged with offenses against the laws of the United States. This Court has jurisdiction over this appeal pursuant to 28 U.S.C. § 1291, which gives the courts of appeals jurisdiction over all final decisions of the district courts of the United States, and 18 U.S.C. § 3742(a), which authorizes the defendants' appeal of their sentences. The notices of appeal, DE:591; DE:592; DE:593, were timely filed on June 2, 2022, from the final judgments, DE:580; 581;

582, entered on May 20, 2022. The amended notice of appeal, DE:661, was timely filed on September 1, 2023, from the amended final judgments, DE:656, DE:657, DE:658, which were entered on August 21, 2023.

## STATEMENT OF THE ISSUES

1. Whether the Government proved that misrepresentations by a wholesaler regarding the destination of the goods purchased (i.e. "diversion") were material to the parties' bargain where the manufacturers set their own prices, received full payment for every sale, knew that substantial quantities of product were reaching the intended Suriname market, and at least one company continued selling even after learning that much of the product was being sold domestically.

2. Whether the district court denied Appellants a fair determination of materiality by instructing the jury, and permitting the Government to argue, that the manufacturer-sellers' conduct was irrelevant even though their continued sales after learning of diversion and other contemporaneous conduct constituted objective evidence of the alleged restrictions' immateriality.

3. Whether the substantive wire-fraud convictions on Counts 2, 5, 8, and 9 can stand where the charged transmissions were not in furtherance of the alleged scheme to obtain discounted products but instead followed complete execution of any alleged scheme.

4. Whether the convictions under 18 U.S.C. § 670 can stand where the manufacturers voluntarily transferred the infant formula for the full agreed-upon purchase price and where the Government proceeded on the theory that the manufacturers were deceived about anticipated diversion of some of the product but failed to prove that Appellants "obtained" the medical products themselves "by fraud or deception."

5. Whether the smuggling convictions under 18 U.S.C. § 554 can stand where the goods were lawful to export, the charged export information was accurate when submitted by third-party freight agents, and the Government's theory depended on later conduct retroactively transforming truthful Automated Export System filings into knowingly false or misleading export information.

6. Whether the money laundering convictions must be vacated where the Government failed to prove criminally derived proceeds.

7. Whether the district court committed reversible sentencing error by imposing a 24-level loss enhancement based on hypothetical profits from domestic transactions the Government never proved would have occurred and then treating that enormous Guidelines error as harmless based only on the court's statement that it would impose the same 220-month sentence regardless of the correct Guidelines range.

## STATEMENT OF THE CASE

### Introduction

*Raoul Doekhie and Sherida Nabi*

Raoul Doekhie and Sherida Nabi are husband and wife. For decades before this prosecution, they ran Tropical Marketing & Distribution, N.V., a genuine import-distribution business in Suriname — putting infant formula on the shelves of supermarkets and into public health clinics. There was no evidence the needs of the Suriname market were not met; rather, the evidence showed baby formula did reach the intended Suriname market. Nevertheless, Doekhie and Nabi are serving 220-month prison sentences because in some instances, they resold the product they purchased to distributors in the American market, rather than distributing 100 percent of it in the Suriname market. The price-per-unit was cheaper if the product was going to Suriname.

American manufacturers set their own export prices, in some instances generated their own volume forecasts, and sent their own company representatives to Suriname to ensure product was being distributed there. These representatives (who worked for companies the Government says are victims) toured the warehouses and saw the product in the stores and the Government clinics. The companies collected full payment on every invoice. When a finance director was asked at trial to quantify what his company had lost, he pointed to a chart he agreed

showed only "potential loss." DE:614:84. For this, Mr. Doekhie and Ms. Nabi—first-time offenders in their fifties, and citizens of the Netherlands with no criminal history anywhere—each received 220 months in federal prison and a forfeiture judgment of nearly $70 million: sentences that will consume what remains of their working lives, if not the rest of their lives, for business transactions in which every party was paid in full at a price it selected and in which every party received the benefit for which it bargained.

The convictions cannot stand. The jury that convicted them was instructed to disregard key defense evidence related to materiality, and the Government's proof of materiality was lacking. When defense counsel in closing made arguments about the conduct of the purported victim companies (whose actions are eminently relevant to what they understood to be the nature of their bargain, and accordingly the essential materiality element), objections to "victim-blaming" were improperly sustained.

The Government, meanwhile, was permitted to try a case that far exceeded the charges by the grand jury—and expanded the indictment at trial to include up to sixty companies, when only four were charged, and a start date that by six years preceded that which was charged in the indictment. What was at most a breached contract transformed in this case into a nearly twenty-year prison sentence: potentially a life sentence. The sentences and convictions must be reversed.

*Johnny Grobman*

Johnny Grobman likewise stands before this Court as a first-time, non-violent offender who received a 220-month federal prison sentence for conduct that at worst amounted to a breach of contract. The profound unfairness of this outcome permeates the record. Mr. Grobman's scheme involved buying consumer products (like baby formula) at a discount by telling manufacturers the goods were destined for export (which often they were), then reselling some products in the United States. Importantly, the manufacturers profited from Grobman's purchases – they suffered no traditional property loss. Instead, the Government's theory is that they did not make as much as they would have liked to have made had Grobman purchased the goods at the domestic price instead of the foreign price. There were no defrauded customers or investors left unpaid; no product was stolen; no one was left holding worthless goods. The "victims" in this case (large formula and medical product companies) profited millions. Yet Grobman was punished more harshly than many violent criminals – almost 20 *years* in prison, followed by forfeiture approaching $87 *million*. Such a draconian outcome is grossly disproportionate to the offense, especially given that no tangible harm befell the companies involved. It raises a disturbing question: how did a business dispute in the gray market of product diversion turn into a federal fraud conviction with a near-life-destroying punishment?

This brief centers on materiality and that theme of disproportionate punishment for an immaterial contractual dispute that caused no direct loss of property. Mr. Grobman's trial was fundamentally unfair in multiple respects, warranting reversal of his convictions. Mr. Grobman's 220-month sentence cannot withstand review. The district court's calculation of over $100 million in "loss" was flawed and vastly overstated, triggering a +24 offense-level enhancement that treated Grobman like a kingpin or terrorist. This loss figure – essentially the difference between domestic and export pricing – does not reflect any actual loss suffered by the manufacturers, who were paid fully for every product sold. Punishing Grobman as if he caused $100 million in damage is illogical and excessive, and it led to a Guidelines range that was patently unreasonable. Unsurprisingly, sentences in comparable cases are far lower. In fact, nationwide data show that for frauds involving $65–150 million, the average sentence is only around 90 months – almost 180 months below Grobman's advisory guideline minimum. And in a nearly identical product-diversion case from the same district, *United States v. Javat*, the court varied downward to 120 months (10 years) despite a Guidelines range of 324–405 months, explicitly calling the higher range "*unreasonable*." No. 18-cr-20668, DE:500:111 (S.D. Fla. Dec. 16, 2019) (emphasis added). Mr. Grobman's 220-month sentence – 130 months above the national average for his loss bracket, and higher than many sentences for violent and repeat offenders – creates an unwarranted

disparity both with codefendants and with similar defendants across the country. Finally, such a severe sentence ignores critical mitigating facts under 18 U.S.C. § 3553(a). Johnny Grobman is a family man and first-time offender who led an otherwise exemplary life: a devoted husband and father of three young girls, a generous community member, and a successful entrepreneur with no criminal history. His conduct did not victimize anyone in the traditional sense and pales in severity next to offenses like armed robbery or drug trafficking – yet his punishment is comparable to or greater than those far more serious crimes.

In sum, this Court should not let Mr. Grobman's conviction and sentence stand. The trial errors require that his convictions be vacated or a new trial granted. At a minimum, the 220-month sentence should be vacated as substantively unreasonable and based on clearly erroneous loss calculations. This case exemplifies the overreach of federal fraud and sentencing laws – stretching a fraud statute to cover a contractual lie and using a Guidelines formula that equates a pricing misrepresentation with crimes of deadly violence. The Court should realign this prosecution with reality and justice: Johnny Grobman is not the callous villain the Government portrayed, but a man who made an error in the murky realm of gray-market commerce. The punishment imposed is far too severe for the conduct in question. The law, and basic fairness, compel relief.

## Statement of Facts, Course of Proceedings, and Disposition in the District Court

Tropical Marketing & Distribution was an import distribution business in Suriname—it purchased products, including baby formula, ophthalmic products, Domino sugar, and natural foods, and it sold those products in the Suriname market. Appellant Raoul Doekhie was Tropical's director; his wife, Sherida Nabi, was the company's sales and marketing manager. Some of the products purchased under the contracts were at times resold back in the United States; the evidence showed, however, that notwithstanding this so-called "diversion," the needs of the Suriname market were still being met. Accordingly, product diverted was in excess of that needed to satisfy the intended market. Johnny Grobman was a downstream purchaser of some products resold by Tropical; he operated a wholesale distribution business in Miami-Dade County. The Government considered this to be *criminal fraud*, on the theory that Suriname-destined products could be purchased for less than products intended for distribution in the American market. The fundamental problem with this theory was that such destination restrictions were often either not addressed or not material to the various contracts with the manufacturers—and the applicable contracts were often silent on the question what may be done with any additional product, provided the needs of the Suriname market were met. Further, the nature of the bargain as to final destination was inherently ambiguous. The bargain's resulting in a discount to Appellants, where Appellants fulfilled the essential bargained-for

task of providing to the Suriname market and where the latent details of such bargain were ambiguous, does not sustain a conviction for wire fraud.

Appellants were charged respectively with various Counts contained in a 31-Count indictment, including:

- Conspiracy to Commit Wire Fraud, in violation of 18 U.S.C. § 1349 (Count 1) (Doekhie, Grobman, Nabi)

- Wire Fraud, in violation of 18 U.S.C. §1343 (Counts 2-9) (Doekhie and Nabi charged in all Counts; Grobman charged only in 2, 8, and 9)

- Money laundering, in violation of 18 U.S.C. § 1957 (Counts 10-20) (Doekhie and Nabi charged in 18-19; Grobman charged in 10-17)

- Conspiracy to obtain pre-retail medical products by fraud or deception, in violation of 18 U.S.C. § 670(a)(6) (Count 21) (Doekhie, Grobman, Nabi)

- Theft of Pre-Retail Medical Products, in violation of 18 U.S.C. § 670(a)(1) (Counts 22-29) (Doekhie and Nabi)

- Smuggling Goods from the United States, in violation of 18 U.S.C. § 554 (Counts 30-31) (Doekhie, Nabi, Grobman)

Appellants maintained their innocence and went to trial. The Government dismissed Counts 14 and 17 (both money laundering Counts) mid-trial. The district court entered a judgment of acquittal on Count 11 (also a money laundering Count).

Doekhie and Nabi were each convicted of 22 Counts—conspiracy to commit wire fraud (Count 1); substantive wire fraud (Counts 2-9); money laundering (Counts 18-19); conspiracy to obtain pre-retail medical products by fraud/deception (Count 21); theft of pre-retail medical products (Counts 22-29); and smuggling

(Counts 30-31). Appellant Grobman was convicted of 13 Counts—wire fraud conspiracy (Count 1); substantive wire fraud (Counts 2, 8, 9); money laundering (Counts 10, 12, 13, 15, 16, 20); conspiracy to obtain pre-retail medical products by fraud/deception (Count 21); and smuggling (Counts 30-31).

Materiality and the nature of the parties' bargains were central to the defense throughout trial. In opening statement, counsel framed the case as one concerning "relationships between companies, the sale of products, the payment of products, and the distribution of products," rather than criminal fraud, DE:612:38, and specifically emphasized that Mead Johnson continued selling to Tropical after learning of diversion, shipping another 1.7 million cans worth approximately $11 million in 2018. DE:612:47. Appellants likewise argued that Alcon continued millions of dollars in sales after learning of suspected diversion. DE:612:55. At the Rule 29 stage, counsel expressly argued that any alleged deceit had to affect "the very nature of the bargain," emphasizing that the manufacturers established the prices and received the "bargained-for price." DE:619:242-50. At the charge conference, counsel expressly invoked "the issue of materiality of a representation" and reiterated that "[o]ur position has always been" that the inquiry concerned the parties' actual agreements and relationships. DE:621:129. And in closing, counsel again urged the jury to determine what actually mattered to the manufacturers by

looking not merely to their trial testimony but to "what they do, or what they did at the time." DE:621:270.

## I. The charges: four alleged "victim" companies with varying contractual requirements

The indictment's charges and the evidence introduced at trial focused on Tropical's conduct as an export customer of four American manufacturers: Mead Johnson (Enfamil baby formula); Alcon (ophthalmic products); American Sugar Refining—aka Domino (sugar); and Eden Foods (natural foods). Each company set its own sales prices for products destined for Suriname. These prices were generally lower than the prices for products to be distributed in the American market. With respect to at least one of the purported victim companies, export customers needed to prepay *before* the product left the manufacturer's warehouse. DE:612:85; DE:612:188. The evidence showed that every invoice was paid for the product it provided. Mead Johnson "always got paid." DE:618:74. Eden required and received payment up front. DE:612:188. Domino was prepaid. DE:615:173. When asked to quantify Mead Johnson's injury, its own finance director produced a chart that he agreed showed only "potential loss." DE:614:84. The proof at trial demonstrated as follows with respect to the separate agreements with each company:

*A. The contracts sometimes did not contain restrictions related to diversion, or sale of additional product provided the needs of the intended market were satisfied—and when they did, such restrictions were not material*

i. <u>Eden – No written agreement, just Account application and purchase orders</u>

As to the Eden allegations, Government witness James Hughes testified that when the business relationship between Tropical and Eden began, there was no written agreement. DE:612:184. Rather, at that time, everything was done by purchase orders and invoices. *Id*. Hughes confirmed that there was *no* restriction on the purchase orders and invoices that the product must remain in Suriname or could not be imported back into the United States. The Government relied on a 2012 Account Prospect form and credit application which occurred nearly four years prior to the first order—Hughes, however, conceded that with respect to this document, "there is no agreement" between Eden and Tropical, "there's just an application." DE:612:186-87 (referring to an Account prospectus and credit application). The credit application was denied, at least at the time it was submitted. DE:612:188. In denying the credit application, Eden sent a letter to Tropical stating its "terms and policies" were enclosed—but never attached a price list and terms and policies. DE:612:189. This letter, *which failed to attach any relevant terms*, would have necessarily superseded the terms signed onto in the original "Account prospectus" application. *Id*. The Government's reliance on the original application served to

distract from the core proof deficiency in the letter's failure to attach any terms and conditions.

ii. <u>Alcon – Exclusivity clause was not material to the contract and did not address sales outside the intended territory</u>

Alcon witness Ronald Questell made clear that he was not required by his company "to restrict the amount of product sold to Suriname if it exceeded the Surinamese consumption capacity" nor was he required "to take into consideration the maximum consumption capacity of Suriname in fulfilling orders from Tropical for Alcon product." DE:620:208. As Questell said he would never have raised such an issue with his managers of the purported-victim company, because "those type of question . . . you learn in your career that they're career stoppers. So, I wasn't gonna go and ask a manager why we were selling that much." DE:620:208-209. Questell, when asked if Tropical was in 2012 (when the business relationship was formed) prohibited in writing from selling product outside the territory of Suriname, replied, "Not that I'm aware of." DE:620:212.

iii. <u>Domino – No evidence of any written restriction on resale of products in the United States</u>

The Government never introduced any written restrictions prohibiting the resale of products in the United States. The Government introduced contractual language that "seller's acceptance of buyer's purchase order or other offer to purchase product, is strictly subject to the terms and conditions contained herein and

in seller's standard terms and conditions, located at www.asr-group.com, which are incorporated herein by reference (collectively 'contract')." DE:615:186. *The Government never introduced those standard terms and conditions*, apparently appearing somewhere—though it is impossible to know where—on the main page of the ASR Group website.

Rather than identify the precise language of the standard terms and conditions purportedly appearing on the website at the time of the contract (if any such terms and conditions in fact existed), the Government instead asked witness Robert Wester if he was "generally familiar" with "what those terms and conditions are for export sales." *Id*. Wester said that he was—not based on having reviewed *the actual terms themselves*—but rather based on his "personal experience." *Id*. The Government then led the witness to concede that "one of those terms and conditions [is] that the product won't be sold outside of the agreed-upon territory." DE:615:186-87. The Government then elicited improper contractual interpretation from a witness who never testified as to having read the specific "standard terms and conditions" purportedly appearing on the URL that it was "fair to say that every one of these contract confirmations in every one of these transactions was based on that idea." *Id*. The Government then, over defense objection, asked if the hearsay contractual terms (testified about by the witness who may or may not have had personal knowledge of such terms) were "in addition to all the statements you had made to

defendants orally in your various meetings," *id.*—again introducing hearsay testimony and extracontractual requirements.

The Government sought to elicit general testimony that the products were not supposed to be sold in the United States. The Government did not adduce proof regarding specific restrictions of *excess* product, provided the needs of the Suriname market had been met. Instead, the Government sought to suggest that the contracts were a sham from inception: this was contradicted, however, by evidence that demonstrated the products were indeed reaching the intended market.

iv. Mead Johnson – No written agreement prior to 2015; subsequent exclusivity clause was not material because Suriname market needs were being met

There was no written agreement with Mead Johnson prior to 2015. Rather, every transaction that preceded 2015 was handled by purchase orders and invoices. DE:614:53. In 2015, there was a distributor agreement that stated: "Buyer shall not sell any of the products to any third party outside the territory or any third party within the territory when it knows or suspects that such party is to: (a) resell or send the product outside the territory; and/or (b) in any way contribute to the sale or export by any other person or entity of the products outside the territory." DE:616:195.

The evidence revealed that ample product was being sold in Suriname, suggesting the market's needs were being met: Mead Johnson witness Gregory Bray, for example, testified that a random sampling indicated that between 2014 and 2016,

"26,000-plus some odd ca[ses] had been reimported into the U.S." DE:614:82. Mead Johnson did not terminate Tropical Marketing's distribution agreement after learning this; rather, they kept selling to them for the next several years. DE:614:144. As Bray testified: "***[W]e did know how much formula was going into the country and feeding babies***. ***So, to eliminate a contract completely*** based off of only an investigation ***would limit the product that could go to fulfill that country and feed the infants***." DE:614:147 (emphasis added). In other words, any re-importation restriction did not go to the heart of the bargain.

With respect to the Mead Johnson Counts, the district court commented on the Government's "very bizarre" decision "not to call any witness who had one-on-one with the defendants at the time the relationship started." DE:619:252-253 ("I thought all along they were going to call Alvarez, he was going to put in the 2007 agreement, there would be no Rule 29 problem. They decided not to call Alvarez. And I see a genuine Rule 29 problem for them").

*B. The evidence showed that Tropical's orders were consistent with manufacturers' own sales forecasts and business interests.*

The evidence at trial revealed that Tropical's orders were not out of the ordinary and were consistent with the victim companies' own sales targets.

Indeed, the purported victim companies *wanted* to maximize the market in Suriname. As Alcon witness Questell testified, he was encouraged by Alcon to sell more to Tropical every time they purchased, DE:620:209, and his company's "profit

plans" were "consistent with that indication to sell more." DE:620:210. Separately, Alcon's distribution agreement with Tropical *required* Tropical to meet certain sales contracts; the agreement itself said that "if at the end of any year, the minimum sales targets have not been attained, Alcon will be entitled, at its sole choice and discretion to terminate the agreement." DE:613:58. Purchase quantities thus had a *manufacturer-imposed floor* that was *material* to the contract and that was apparently untethered to actual consumption figures.

As to Mead Johnson, Government witness Gregory Bray, Mead Johnson's finance director, testified Mead Johnson's local market would send a forecast to the U.S. office with "the amount of product that we would expect the distributor to request." DE:614:46. The Government focused its case heavily on "Suriname Tender Office purchase orders" but Bray *repeatedly* testified on cross-examination that he did not know whether these orders were included in that which the local market reviewed before sending a forecast. DE:615:83-84. Candice Khan-Hosein, another Mead Johnson witness, said that the finance department would prepare annual sales forecasts "based on historical information." DE:616:107-08. These annual sales forecasts were also "shared with each distributor[.]" *Id*. Accordingly, sales targets were set by the *manufacturer*.

*C. Tropical fulfilled the heart of the bargain: The products were delivered to Suriname and put to use.*

Rashida Moesaheb, the financial director at the Regional Healthcare Foundation in Suriname (RGD) testified that her Government-subsidized non-profit provides formula to all of the women who live in Suriname. DE:620:187-190. She testified that RGD uses Government subsidies to purchase from distributors. DE:620:190. She said that 2,800 cases—403,000—cans were sold annually. DE:620:190-95.

Alcon witness Questell confirmed Alcon products "were sold to a Government hospital in Suriname,"—Academic Hospital—and that he personally observed those Alcon products at the hospital in Suriname. DE:620:227.

Khan-Hosein, a Mead Johnson witness, conceded on cross-examination that she had visited clinics, pharmacies, and hospitals in Suriname and witnessed the Enfamil product being offered. DE:616:73. She conceded that it was not "as if this was all fake, where you didn't see the Government actually offering the product"; that "was the Government offering the product to consumers, yes." DE:616:73-74. She confirmed that "the product ended up at the Government clinics," and that she "saw it with [her] own eyes." DE:616:77. She also testified that she was "not alarmed by the usage"; as she said "we did our analysis of births in the markets" and the defendants would have indicated that "the births would have been in excess of what we would have seen online, because there were many people who had unregistered

births . . . there were people who lived in the bush, in rural areas of Suriname, who would have had babies and not register them. So, I was not alarmed by the usage." DE:616:45. Khan-Hosein thus confirmed that against the backdrop of her company's own birth analysis, the volumes ordered by the Appellants did not alarm her.

As for Domino, witness Wester testified that he would "go unannounced" to Suriname to verify that product was being sold. He went "multiple times" to the Tropical Marketing warehouse, toured their facility and did store checks. DE:615:192-93. He went to Tropical's offices and their adjacent warehouse. DE:615:221. And he saw that this was a "real operation"—not a sham. DE:615:221-22. In fact, Tropical *passed* the market research conducted by Domino. DE:615:222. When Wester went to the stores, he saw Domino bags on their floor; it was "stacked up like it normally is in every warehouse"; Wester also observed the product in "actual stores . . . Supermarkets." *Id*. When he did market surveys, these visits revealed that "everything was good" and "everything was fine." *Id*. at 223. Similarly, Government witness Edgar Torres confirmed that cases of Enfamil were indeed shipped to Suriname. DE:617:67.

## II. The district court's evidentiary rulings

The district court at trial allowed the Government's case to balloon outside the charges in the indictment but repeatedly narrowed the defense case. Over defense objection, the Government's cooperating witness was permitted to testify that "at

least 60" companies were defrauded; the Government's case agent read into the record emails concerning scores of uncharged companies and products. The district court admitted the evidence as charged conduct or as evidence that was inextricably intertwined with charged conduct. *See* DE:616:219-33; DE:616:331-33; DE:620:148-50. There was no limiting instruction. In closing argument, the Government invoked the "60 companies" and the "duration of this conspiracy." DE:620:267.

The district court pre-trial precluded the defense expert from addressing whether the diversion of genuine goods is unlawful. During trial, he was allowed to testify with "the shortest possible leash." DE:620:130. Government objections regarding how company motivations play into the issue of allowing diversion were sustained; as were objections to attempts to lay a foundation to overcome previously sustained objections. DE:620:148-150.

The district court's rulings also limited what the jury could hear about—and how the defense could use—the purported victim companies' own conduct. The district court precluded testimony regarding the legality of diversion. DE:618:48. The defense was also prohibited from using Defense Exhibit 200, to cross-examine the Mead Johnson witnesses. That exhibit reflected the Suriname Customs March 2017 notice to Mead Johnson and showed that after learning of diversion, Mead Johnson continued to do business with Tropical. The exhibit was later introduced in

the defense case but only by stipulation and after every purported victim witness had left the stand.

During closing argument, when counsel for Appellant Grobman argued that the companies' own conduct showed they did not consider themselves victims, the district court sustained the Government's speaking objection to "victim blaming." DE:621:270.

### III. The charge to the jury

While precluding evidence related to the lawfulness of diversion, the district court also did not give a defense-requested instruction as a limiting instruction to the jury. The court at the charge conference declined to instruct that diversion was not itself unlawful and *also* sought a commitment from defense counsel that it would not say in closing argument that "diversion is in and of itself legal." DE:621:69-74.

The jury was also instructed that evidence the manufacturer companies "could have done something to prevent any fraud" or that "their procedures were somehow deficient, should not be considered by you as an excuse or defense," and that it is no defense that a manufacturer "should have known about the fraud, or that it should have stopped the fraud after it allegedly discovered it." DE:337:14.

The charge also instructed the jury that negligence is no defense; that "[e]ven if the victim later embraced the scheme despite being aware of the fraud, that would not extinguish the scheme itself, or the defendant's initial intent to deceive." DE:337.

The instructions also told the jury that "It is a defense to show that there was an agreement between the Defendants and the Companies not to restrict the sale of goods to the territory of Suriname," and that it was up to the jury to "determine whether the evidence was consistent with such an agreement." DE:337.

## IV. The Rule 29 proceedings

At the close of the Government's case, the district court pressed the Government on how a scheme charged as devised no earlier than March 2013 could rest on a cooperator's Account of a 2007 beginning. DE:619:242. The Government had charged a scheme beginning in 2013 but testimony from cooperator Torres recounted a 2007 inception. There was an absence of inception witnesses to testify as to the formation of the relationship with at least one purported manufacturer company. DE:619:247 ("I don't know if Mr. Torres was telling the truth, but at the Rule 29, I'm required—we are all required to assume that that testimony is true, that the relationship begun in 2007. How to square that with the fact that the charge begins in 2013, I have no idea."). The court initially flagged that the Mead Johnson Counts "may be a problem" for the Government regarding the sufficiency question of "When did the terms of no reimportation begin?" *Id*. at 252-53. (district court remarking on the "frankly, odd way in which the Government's case unfolded in this trial, which is they decided not to call any witness who had one-on-one with the

defendants at the time that the relationship started, very bizarre"). The district court ultimately denied the motions for judgments of acquittal as to the wire fraud Counts.

As to Grobman specifically, a downstream purchaser who did not transact with the manufacturer companies, the district court agreed that there was no evidence of any misrepresentation by Mr. Grobman, noting that if "the Government had brought simply a substantive wire fraud Count against Mr. Grobman with no aiding and abetting liability attached to it, then I would Rule 29 it. That's easy. There's no evidence of that." DE:620:43-44. Nevertheless, the district court sustained the verdict as to Grobman on the fraud Counts.

On the money laundering Counts, the district court granted a judgment of acquittal, reasoning that the email introduced as evidence was too attenuated from the charged conduct (by a period of two years). DE:620:269-70 ("I think it's too much a stretch to say that a reasonable jury can find . . . that the transaction in 2015 came from illegally derived proceeds, just based on an email that happened in 2017").

After argument over the applicable *mens rea* with respect to the smuggling Counts, the district court denied the Rule 29 motion but noted that the defense's argument had "allure" and that the issue had not been "fleshed out by other courts." DE:620:324; DE:621:141-42.

### V. Forfeiture and Sentencing

On August 26, 2021, the district court held a preliminary forfeiture hearing. The district court formulated its own test under 18 U.S.C. § 981(a)(2) with respect to how net proceeds should be calculated as follows, finding the case to be "akin to securities fraud cases." DE:695:18, reasoning "[i]f I'm engaging in securities fraud, I sell a security, and I know something bad about that security that no one else knows . . . we ask the same question: Had I come clean, would I have been allowed to engage in the conduct?" *Id*. With respect to Appellants, the district court found "[h]ad they gone to these companies and told them . . . 'Hey, I am going to sell these products in the United States,' they would have been allowed to do so; they would have just had to pay a much higher price." *Id*. at 19. In other words, where value is provided, "we allow you to net out those costs[.]" *Id*. at 21. "[I]n Subsection (b) we net out; whereas, in Subsection (a), we don't net out." *Id*. Because this case resembles the securities fraud context, the district court found, "we should be netting out." *Id*. In other words, the district court found that Appellants provided value to the purported victim companies.

At sentencing, Probation recommended a 24-level enhancement based on a purported loss amount of more than $65 million but less than $150 million. After distinguishing this type of fraud from Medicare fraud cases at the forfeiture hearing (finding it more analogous to securities fraud, with the material difference being the

victim receives value), the district court rejected defense arguments that there was no loss cognizable under U.S.S.G. § 2B1.1 because each manufacturer set its own export price, was paid that price in full, and voluntarily shipped the goods. The defense objected to the government's "delta" theory as impermissibly treating foregone profits on hypothetical future sales as cognizable loss for guideline purposes. *See United States v. Bruchhausen*, 977 F.2d 464, 467–68 (9th Cir. 1992) (holding that manufacturers that received the full sale price "clearly suffered no monetary loss," even though the defendant's deception induced sales they otherwise would have refused). The defense argued that any such presumed differential is purely speculative absent proof of available domestic purchasers who would purchase at the same volume.

The district court overruled the defense loss objections, and over defense objection found there to be 13 victims, warranting an enhancement for more than 10 victims under U.S.S.G. § 2B1.1(b)(2). The district court computed a total offense level of 39, with criminal history category I, resulting in an advisory Guidelines range of 262 to 327 months for each defendant. The court varied downward and imposed concurrent sentences of 220 months as to each Appellant. After pronouncing sentence, the district court made a so-called *Keene* finding, stating that "[u]nder *United States v. Keene*, I would have imposed the same sentence regardless of my ruling on the objections. And that goes, of course, for the role enhancement,

which I elected not to apply, but which I understand was very close and may well have applied in other circumstances." DE:623:303; *see United States v. Keene*, 470 F.3d 1347 (11th Cir. 2006). The district court offered no explanation of how a 220-month sentence could possibly be justified under 18 U.S.C. § 3553(a) if the loss objection were sustained and the Guidelines range calculated accordingly.

## STANDARDS OF REVIEW

This Court reviews challenges to the sufficiency of the evidence de novo. *United States v. Diamond*, 102 F.4th 1347, 1353 (11th Cir. 2024). A district court's interpretation of the Federal Rules of Criminal Procedure and Federal Rules of Evidence is reviewed *de novo*. *United States v. Campa*, 459 F.3d 1121, 1174 (11th Cir. 2006); *Long v. Raymond Corp*., 245 Fed. Appx. 912, 913 (11th Cir. 2007). Statutory construction, including as it relates to jury charges, is reviewed *de novo*. *Fidelity Interior Construction v. Se. Carpenters Reg'l Council of United Broth. of Carpenters & Joiners of Am.*, 675 F.3d 1250, 1259 (11th Cir. 2012). More generally, review of trial errors, including instructional and evidentiary and closing argument improprieties, is for abuse of discretion. *United States v. Carrasco*, 381 F.3d 1237, 1242 (11th Cir. 2004) (instructional); *United States v. Frazier*, 387 F.3d 1244, 1276 (11th Cir. 2004) (en banc) (evidentiary); *United States v. Moran*, 778 F.3d 942, 959 (11th Cir. 2015) (closing argument). *See also Klay v. United Healthgroup, Inc.*, 376 F.3d 1092, 1096 (11th Cir. 2004) (abuse of discretion where district court

"applies an incorrect legal standard, follows improper procedures in making the determination," "makes findings of fact that are clearly erroneous," or "appl[ies] the law in an unreasonable or incorrect manner") (citation omitted). In reviewing cumulative error, the total prejudicial effect of the trial errors, both preserved and plain, must be weighed *de novo*. *United States v. Dohan*, 508 F.3d 989, 993 (11th Cir. 2007). For sentencing and forfeiture claims, this Court reviews factual findings for clear error and legal questions *de novo*. *United States v. Rothenberg*, 610 F.3d 621, 624 (11th Cir. 2010); *United States v. Browne*, 505 F.3d 1229, 1278 (11th Cir. 2007). This Court reviews *de novo* the legality of an order of restitution. *See United States v. Hasson*, 333 F.3d 1264, 1275 (11th Cir. 2003). Whether a person or entity was a victim of a fraud offense is reviewed *de novo*. *See United States v. Martin*, 803 F.3d 581, 593 (11th Cir. 2015).

## SUMMARY OF THE ARGUMENT

This was a criminal wire fraud prosecution based on purported breaches of non-material—and at times non-existent—terms of contracts with four sophisticated manufacturers. The manufacturers set their own export prices and collected full payment on every invoice; two of them generated their own volume forecasts or volume targets. Appellants fulfilled the heart of the bargain: they delivered product to Suriname, the intended destination, and there was no indication that the needs of the Suriname market were not met. The re-routing of some of the product to the

domestic market is what formed the basis for the charges—yet the governing agreements were generally unclear as to what was to be done with product if the quantities purchased were greater than that needed to satisfy the intended market. At least one company, Mead Johnson (the primary alleged victim company and the one relied upon for loss amount at sentencing) continued selling to Appellants after learning of this diversion. The Government failed to prove materiality as to each manufacturer company charged in the indictment.

The deficiencies in proof as to materiality were made worse by the fact that the jury never fairly determined the materiality of any charged misrepresentation. The district court's charge to the jury instructed it to disregard key exculpatory evidence related to materiality; the jury was told that evidence that the companies "could have done something to prevent any fraud" "should not be considered by you as an excuse or a defense"; that it "doesn't matter" whether the decision-maker "knew or should have known that the statement was false" or whether a victim company "later embraced the scheme despite being aware of the fraud." DE:337.

These instructions had the effect of watering down the rigorous materiality standard, described by the Supreme Court as a "demanding" one that "under any understanding of the concept" looks to the effect of the misrepresentation "on the likely or actual behavior of the recipient of the alleged misrepresentation." *Universal Health Services, Inc. v. United States ex rel. Escobar*, 579 U.S. 176, 193 (2016)

(internal quotation marks and citation omitted). These instructional errors were compounded by the fact that when defense counsel made arguments related to the victim companies' conduct in closing, the district court sustained the Government's "victim blaming" objections, DE:621:270, further causing prejudice to the defense by preventing it from effectively arguing the essential element on which the Government's evidence was the weakest. The Government in *Kousisis v. United States*, 605 U.S. 114 (2025) argued to the Supreme Court that a demanding materiality statute confines the fraud statutes and prevents them from targeting "benign, everyday misstatements." *Id*. at 146 (Thomas, J., concurring) (citing Brief for United States 43). Justice Thomas explained in *Kousisis* that a demanding approach to materiality is "all that prevents an 'extraordinarily expansive view of liability' from rendering the federal wire-fraud statute nearly limitless in scope, *Escobar*, 579 U.S. at 196, lower courts should hold the Government to its word." *Kousisis*, 605 U.S. at 146. The district court's instructions and narrowing of the defense argument in closing had the effect of precluding the jury from fairly determining whether the Government satisfied the rigorous materiality standard.

Four of the eight substantive wire-fraud Counts fail for an independent reason. The charged wire transmissions submitted to the jury were not in furtherance of any fraud scheme. Count 2 reports lost business and post-dates the final order from manufacturer Eden. Count 5 consists of an email in which Nabi forwards a victim

company's own email to the freight forwarder. Count 8 consists of an email declaring the relationship with one manufacturer as "impossible now." Count 9 similarly relates to post-execution conduct that did not further the fraud scheme. These transmissions were sent after the fraud scheme had been executed and cannot sustain the convictions.

The pre-retail theft of medical products convictions under 18 U.S.C. § 670 fail because the Government failed to prove the products were "obtained by fraud or deception." Mead Johnson, the manufacturer, transferred each case voluntarily at its own price and was paid in full. As the jury was instructed, "[b]y fraud" requires deception that influences the victim's action "to his damage", DE:621:163, and even the Government's own witness conceded only "potential loss," DE:614:84, not actual damage. "By deception," meanwhile, requires a "material" statement that is "likely to mislead someone acting reasonably under the circumstances." DE:621:164. The Government failed to prove materiality for the reasons discussed above, particularly where the charged purchase orders were fulfilled after Mead Johnson was aware of inaccuracies in export representations. *See* DX D-200 (March 30, 2017, email from Suriname's customs service to Mead Johnson, reporting that a container shipped by Tropical and documented as containing infant formula had been found to contain sheetrock). Any deception cannot be deemed material based on Mead Johnson's own conduct.

The smuggling convictions under 18 U.S.C. § 554 must be reversed where nothing about the goods or their exportation was unlawful. As the jury instructions recognized, the export-control regulations "do not apply to the products at issue" and relate only to the "export of items that could threaten national security." DE:621:168. The predicate regulation charged was 15 C.F.R. § 30.71, which addresses anyone who knowingly submits false export information. The allegedly false filings charged were those submitted by victim company Mead Johnson's own freight agent, Kuehne + Nagel, and were true at the time they were submitted. The district court instructed only that the jury had to find "the defendant knowingly exported merchandise as described in the superseding indictment; two, the defendants' exportation was contrary to 15 C.F.R. § 30.71; and three, the defendant knew that the exportation of the merchandise was contrary to law or regulation." DE:621:169.

The district court expressed doubt as to the proper reading of the statute and recognized the ambiguity; this doubt must be resolved in favor of the Appellants under the rule of lenity. *See Wooden v. United States*, 595 U.S. 360, 388 (2022) (Gorsuch, J., concurring) ("The 'rule of lenity' is a new name for an old idea—the notion that 'penal laws should be construed strictly'") (quoting *The Adventure,* 1 F. Cas. 202, 204 (No. 93) (CC Va. 1812) (Marshall, C.J.)).

The money laundering Counts were submitted under a dual theory, with smuggling and wire fraud charged as the predicates. Accordingly, due to the defects

in both the smuggling and wire fraud convictions as discussed above, the money laundering Counts must also be vacated. If either the smuggling or wire fraud convictions are found to be legally defective by this Court, then the money laundering convictions also must fail. *See Yates v. United States,* 354 U.S. 298, 312 (1957) ("[w]here the verdict is supportable on one ground, but not on another, and it is impossible to tell which ground the jury selected", the verdict must be set aside), *overruled on other grounds by Burks v. United States*, 437 U.S. 1 (1978).

The 220-month sentences were based on a 24-level enhancement for a "loss" that was purely speculative and did not measure actual loss. The figure was reached by calculating the difference between domestic list prices and the export prices. The Government never proved, even under a preponderance standard, that the hypothetical domestic sales would have occurred. The district court's declaration that "[u]nder *United States v. Keene*, I would have imposed the same sentence regardless of my ruling on the objections" (DE:623:303) does not render the error harmless where the error would amount to a roughly 200-month upward variance if the same sentence were later imposed.

## ARGUMENT AND CITATIONS OF AUTHORITY

### I. The wire fraud convictions must be vacated because the Government failed to prove the materiality of any misrepresentation.

Evidence of guilt must be substantial, and if the record reveals a lack of substantial evidence from which a fact-finder could find guilt beyond a reasonable doubt, this Court will reverse the conviction. *United States v. Kelly*, 888 F.2d 732, 740 (11th Cir. 1989). To meet the substantial evidence burden, "reasonable inferences and not mere speculation must support the jury's verdict." *United States v. Adkinson*, 158 F.3d 1147, 1159 (11th Cir. 1998) (citation omitted). *See also United States v. Villegas,* 911 F.2d 623, 628-31 (11th Cir. 1990) (must be more than mere possibility). Meanwhile, "[w]here the verdict is supportable on one ground" but legally invalid "on another, and it is impossible to tell which ground the jury selected", the verdict must be set aside. *Yates*, 354 U.S. at 312. *See also Griffin v. United States*, 502 U.S. 46, 56-59 (1991) (*Yates* rule applies where one ground is legally invalid).

The Government must introduce substantial evidence of guilt as to each element of the offense. The materiality inquiry is essential. Wire "fraud" has its "origins" in the common law, so the Supreme Court has "long interpreted the statutory term 'fraud' (and its variations) . . . by reference to its common-law pedigree." *Kousisis*, 605 U.S. 124. As Justice Gorsuch explained in concurrence in

*Kousisis*, fraud at common law "required proof that the victim was injured." *Id*. at 148 (Gorsuch, J., concurring). To satisfy fraud's injury requirement, "common-law courts usually demanded proof that a defendant deprived his victim of 'what he bargained for.'" *Id*. at 149 (Gorsuch, J., concurring) (quoting *State v. Asher*, 50 Ark. 427, 430-31 (1888)). This is the function of the materiality inquiry; the "traditional benefit-of-the-bargain injury rule"—the test for materiality argued for by the government in *Kousisis*[1]—serves an important purpose in cabining the reach of the wire fraud statute. *Id*. at 151 (Gorsuch, J., concurring).

The majority in *Kousisis* reaffirmed that the materiality element is a "limit on" the federal fraud statutes. 605 U.S. 132. Materiality is a "demanding" standard. *Escobar*, 579 U.S. at 194. "[T]he traditional benefit-of-the-bargain injury rule is not some vestigial limb. It plays an important role in separating mere lies from criminal frauds and, in that way, reducing the risk of frivolous prosecutions." *Kousisis*, 605 U.S. at 151 (Gorsuch, J., concurring). *See also id*. at 146 (Thomas, J., concurring) ("the essence-of-the bargain standard is rigorous and context specific. Although the

[1] The government in *Kousisis* propos[ed] "an essence-of-the-bargain test, under which a misrepresentation is material only if it goes 'to the very essence' of the parties' 'bargain.'" *Kousisis*, 605 U.S. at 131 (quoting *Universal Health Services*, 579 U.S. at 194 n.5 (in turn quoting *Junius Constr. Corp. v. Cohen*, 257 N.Y. 393, 400 (1931)).

contracts in this case used language suggesting the DBE[2] provisions were material…we have made clear that the materiality inquiry turns on substance rather than labels") (citing *Escobar*, 579 U.S. at 190); *Escobar*, 579 U.S. at 194 (materiality cannot be found where noncompliance is minor or insubstantial). Indeed, the Supreme Court repeatedly has refused to "rely upon prosecutorial discretion to narrow the otherwise wide-ranging scope of a criminal statute's highly abstract general statutory language." *Dubin*, 599 U.S. 110, 131 (2023) (quotations omitted). Count 1 charged a broad and overarching conspiracy beginning in 2013 and continuing through 2018 and involving all four companies. Counts 2 through 9 charged substantive wire fraud against four victim companies and incorporated the manner and means section of the conspiracy Count with respect to the specific misrepresentations alleged. The misrepresentations charged in the indictment were that "Doekhie and Nabi sought to purchase the Victim Companies' products exclusively for distribution and use abroad, specifically, in Suriname," and that "they had a Government tender for a particular Victim Company's products." DE:132:6. To the extent that Appellants made any such misrepresentation as to exclusivity (and

---

[2]The painting contracts at issue in *Kousisis* required (pursuant to federal regulation) state agencies to set participation goals for disadvantaged business enterprises ("DBEs"). The contractor in *Kousisis* had represented that it would obtain paint supplies from a certified DBE and was indicted on charges that supplies were obtained instead from non-DBE vendors.

that is not established from the record with respect to at least some of the companies), no such misrepresentation was material.

The heart of the bargain here was delivering product to Suriname and fulfilling the needs of the Suriname market. Appellants performed that core bargained-for aspect of the contract, and the evidence was insufficient where there were no materially false representations or promises to induce the sales. The Government's focus instead was on inapposite evidence of diversion of products—a lawful activity that included efforts to prevent the manufacturers from learning of the diversion, which *could have theoretically* (but as the evidence showed often did not) led to cancellation of future dealings but which no manufacturer claimed to have caused damages even upon discovery.

Product diversion, even surreptitious diversion, into geographic territory to which the manufacturers did not contemplate (i.e. so-called gray market redistribution) does not violate the law. Acting in a manner that deprives a transacting party of information that may have caused the party not to engage in the transaction alone is not fraud. *Ciminelli v. United States*, 598 U.S. 306, 315-16 (2023).

"Under any understanding of the concept, materiality looks to the effect on the likely or actual behavior of the recipient of the alleged misrepresentation." *Kousisis*, 605 U.S. at 139 (Thomas, J., concurring) (quoting *Universal Health*

*Services*, 579 U.S. at 193) (cleaned up). For a contract term to be material, it must go to "the very essence of the bargain." *Id*. (Thomas, J., concurring) (quoting *Escobar*, 579 U.S. at 194). "Materiality goes to the root of the parties' agreement and touches the fundamental purpose of the contract." *Id*. (quoting 23 Williston 63:3, p. 483 (4th ed. 2018) (cleaned up)). "The materiality inquiry does not rest solely on a contract's labels." *Id*. "Even in the face of contrary contract language, materiality 'cannot be found where noncompliance is minor or insubstantial.'" *Id*. (quoting *Escobar*, 579 U.S. at 194). "A party's actions may reveal that a contract term is not material even if the contract's language would suggest otherwise." *Id*. at 139.

The materiality question is not whether the manufacturers suffered an ultimate economic loss. The question instead is whether the charged misrepresentation was important to the manufacturer's decision to enter the transaction. As *Kousisis* explained, materiality "look[s] to the effect on the likely or actual behavior of the recipient of the alleged misrepresentation" and asks whether the misrepresentation constituted an "inducement or motive" to enter the transaction. *Id*. at 131 (cleaned up). That inquiry is objective and intensely factual.

What these sophisticated manufacturers actually did while the business relationships were ongoing is objective evidence of what mattered to them. A company's decision to continue selling after learning of suspected diversion, its decision to maintain differential export pricing, its own generation of ambitious sales

targets, and its knowledge that substantial quantities of product were in fact reaching Suriname all bear directly on whether an exclusivity representation was important to its decision to sell on the terms offered.

That evidence was particularly important because the Government relied heavily on retrospective testimony that the manufacturers would not have made the sales had they known the whole truth. The jury was entitled to compare those litigation-era assertions against the companies' contemporaneous conduct. Indeed, the Supreme Court's formulation of materiality expressly considers the recipient's "actual behavior." *Id*. at 131. The Government could not establish materiality beyond a reasonable doubt merely by eliciting a witness's conclusion that a term mattered while insulating from meaningful consideration the objective evidence of what the company actually did.

The distinction also answers any suggestion that the defense theory depends upon an impermissible "right to control" or no-loss theory. Appellants do not argue that the manufacturers lacked a property interest because they received the agreed price. They argue that the Government failed to prove a materially false representation that induced the transactions charged. Full payment, profitability, continued dealings, manufacturer-generated volume expectations, and actual distribution in Suriname are relevant because they illuminate the nature of the

bargain and the significance the manufacturers themselves attached to the challenged representations.

The defense litigated the substance of this issue from opening statement through Rule 29, the charge conference, closing argument, and post-trial proceedings. The theme was consistent: the Government could not convert these commercial relationships into criminal fraud merely by identifying a false statement or contractual deviation; it had to prove that the alleged deception was sufficiently important to the manufacturers' bargains to constitute fraud.

Most importantly, the issue was squarely presented in the Rule 29 motion. Counsel began by distinguishing deception from fraud and argued that the alleged deceit must involve contemplated harm affecting "the very nature of the bargain." DE:619:242. Counsel then focused directly on what the manufacturers bargained for and received: "all of the companies received the bargained-for price for the merchandise"; "the pricing was established by the companies"; and "the defendants paid the established price." DE:619:243. When counsel returned to "the very nature of the bargain," the district court itself summarized the defense argument as concerning "whether or not the companies received the benefit of their bargain." DE:619:244. That is the substance of the materiality inquiry Appellants press here.

At the charge conference, defense counsel expressly identified "the issue of materiality of a representation," while explaining that "[o]ur position has always

been" that the inquiry had to examine the beginning of the parties' actual relationships and what their agreements were. DE:621:129. The defense built its case around the manufacturers' actual commercial conduct: who set the prices, what quantities the manufacturers themselves forecast or encouraged, whether product actually reached Suriname, what the manufacturers did when they learned of diversion, and whether they nevertheless continued selling. In closing, counsel distilled the point precisely: what revealed what the manufacturers were "really thinking" was not simply what their witnesses said at trial, but "what they do, or what they did at the time." DE:621:270. The Government objected to that argument as "victim blaming," and the objection was sustained. *Id*. The defense thus did not merely preserve the underlying materiality issue; it made the manufacturers' actual behavior a central factual theme of the trial.

*Kousisis* supplies additional guidance concerning the legal significance of those facts, but it does not change the factual theory Appellants presented below. Appellants argued then, as they do now, that the alleged restrictions must be evaluated in the context of the bargains actually made and the manufacturers' actual behavior. The claim is therefore properly before this Court.

A. The Government failed to prove any materially false representation with respect to Eden, and failed to prove any criminal conspiracy to defraud Eden (Counts 1 and 2)

With respect to the Eden-related evidence, the Government failed to introduce substantial evidence of guilt sufficient to sustain the verdict. There was no evidence of any false representation or material omission in the documents governing the transaction. The operative documents on their face contained no restrictions on destination or territory, no limitation that *all* product must remain in Suriname, and no restriction prohibiting product from being transported back to the United States. *See* DE:612:184-85 (agreeing everything was done by purchase orders and invoices at the time; there was no restriction on final destination). The Government introduced terms of export which were "amended from time to time." DE:612:188. The Government's own expert characterized the export terms of sale as governing "different nuances associated with export shipping or export orders." DE:612:87. A contractual nuance does not establish materiality.

Faced with this deficiency, the Government rested on a signed "Account Prospect Form," which is a "form which predates an agreement" and was characterized by Government witness Hughes as "just an application." DE:612:186. It predated by three years any order placed by Tropical.

At the time of the application, there was no evidence of any knowledge on the part of Appellants related to how much product the Suriname market would actually

need and how much would be leftover, and correspondingly no evidence of any intent to cause loss to the company merely by purchasing the goods. Any agreement to terms relating to Suriname distribution reflected an intention and not an agreement that *limited any product purchased* to the Suriname market and precluded it from being distributed elsewhere if market needs were fulfilled. As to the 2012 Account Prospect Form admitted by the Government, the Government's own witness recognized that "nothing went with that until 2015, when we received their first purchase order." DE:612:82. There was no false representation in the Account Prospect Form. *United States v. McCarrick*, 294 F.3d 1286, 1291 (11th Cir. 2002) (holding that the charged offenses required the defendant to possess the specific intent to defraud when he signed the loan documents and that intent formed afterward could not support his convictions).

The Government itself—as well as the purported victim company—conceded the insufficiency of any material contractual clause by relying on a 2017 affidavit, which was never executed by Tropical. *After* the last order with Eden was fulfilled, and thus long after any agreement was formed, *see id*., Eden sent Tropical a demand letter enclosing a proposed affidavit that sought to have Tropical assure that 100 percent of the items purchased at export prices would be targeted for their final destination, ultimate consumption, and use outside of the domestic market. *See* DE:612:169. It does not establish materiality; it provides clear evidence that the

terms of the purchase agreements *did not* restrict destination. A manufacturer's attempting to *change* or to *clarify* the terms of their agreement with a distributor, after such agreements have already been executed, undermines any suggestion that a materially false representation existed at the time the agreement was formed or the orders fulfilled. Notably, this demand (which for the first time included the 100 percent-targeted-for-final-destination-restriction), DE:612:169, *followed* the last fulfilled order with Eden, and Tropical never signed the affidavit. DE:612:171.

The Government attempted to use the unsigned affidavit as evidence of guilt, but it demonstrates the absence of any existing agreement between Eden and Tropical regarding additional product outside of that which reached the Suriname market. As Eden stated in the letter requesting the affidavit: "We regret our failures in allowing gray market feeds to have existed." DE:612:190. That *confessed permission* undermines any accusations of a prior materially false representation. The Government placed heavy emphasis on Nabi's statement in an email that "If we sign, and they find any irregularities, we'll be sued for sure." DE:612:171. That too, however, contradicts any theory of a pre-existing material term in the agreement with Eden.

Nabi's email also undermines any notion of *willful* intent to violate the law as is required to support conspiracy. Concealment of a belatedly disclosed potential and non-material breach of contract, followed by a decision not to do business, is

insufficient to prove conspiracy. Relatedly, with respect to Eden, the Government failed to prove an ongoing criminal conspiracy but merely proved sporadic conduct reflective of ordinary business transactions. The Government's contention was that the conspiracy started in March of 2013; its own witness amended that time period and claimed instead that it began in 2007. The Eden-related evidence indicated that Tropical submitted applications in 2007 and 2013 but made *no purchases* until September of 2015. This reflects ordinary purchaser behavior based on demand; it is wholly consistent with lawful conduct and undermines the Government's notions of a conspiratorial agreement with respect to Eden. The absence of any contractual clause governing materiality combined with the absence of any criminal conspiracy warrants vacatur of the convictions on Counts 1 and 2 of the indictment.

B. Mead's own witness confessed the absence of materiality, warranting vacatur on Counts 1, 3, 4, 6, and 7

Count 1 charged a conspiracy beginning in March of 2013. Counts 3, 4, 6, and 7 charged substantive wire fraud Counts against Mead Johnson. The purported false representation related to a 2015 distributor agreement that precluded redistribution outside of Suriname. *See* 1MJN-112. The Government's own witness, Bray, revealed in testimony that this clause was not at all material. Indeed, upon learning that some cases had been reimported into the United States, Bray said: "***We did know how much formula was going into the country and feeding babies. So, to eliminate a contract completely based off only an investigation would limit the product that***

***could go to fulfill that country and feed the infants***." DE:614:147 (emphasis added).

This statement reveals a fundamental failure of proof as to any misrepresentation that affected the nature-of-the-bargain; this is directly on point testimony about materiality that fully exculpates Appellants as to all the Mead Johnson allegations. The Government's own witness confessed that Tropical was holding up its end of the bargain with respect to the Mead Johnson contract: it was distributing formula to babies in Suriname (distribution that another Mead Johnson witness, Khan-Hosein, testified she personally witnessed). Tropical thus fulfilled the nature of the bargain contemplated in the contract. What was done with excess formula outside of the market was immaterial—even if in breach of the contract—and certainly not material for purposes of the criminal fraud statutes, particularly in light of the record evidence of satisfactory compliance with the heart of the deal.

The falsified Suriname Tender Office documents were a focus of the Government's case but establish at best a misrepresentation and do not sustain the verdict on materiality, particularly where the record demonstrates conclusively that the formula was distributed in Suriname. Moreover, the Government failed to establish any reliance by Mead Johnson on the falsified Suriname Tender Office purchase orders; its witness could not testify that these documents were among those included in the company's internal market review before sending a sales forecast. DE:615:83.

The Government failed to prove the materiality of any misrepresentation made to Mead Johnson. Counts 1, 3, 4, 6, and 7 must be vacated.

C. Alcon's witness similarly testified that halting sales would have been contrary to manufacturer aims, warranting vacatur on Counts 1, 8, and 9

The substantive fraud as to Alcon was charged in Counts 8 and 9, with the overarching conspiracy charged in Count 1. Alcon's distribution agreement with Tropical required Tropical to meet certain sales targets and the contract would terminate if the minimum sales targets had not been satisfied. DE:613:58. This manufacturer-imposed sales floor was material to the contract. What was done with supply if the demand needs of the market in Suriname had been satisfied was not material in any way to the distribution agreement. The evidence showed that the needs of the Suriname market were being met: Alcon witness Questell confirmed that the product was sold to a Government hospital in Suriname and testified that he personally observed those products at the hospital. DE:620:227.

Questell made clear that he was not required by his company to restrict the amount of product sold to Suriname if it exceeded the country's consumption capacity. DE:620:208. Nor was he required to take maximum consumption capacity into consideration when fulfilling orders from Tropical. *Id*. This evidence of the "actual behavior of the recipient of the alleged misrepresentation," *Escobar*, 579

U.S. at 193 (internal quotation omitted), establishes the absence of materiality as to any misrepresentation made to Alcon.

Questell went further: he indicated that such inquiries would not only detract from the benefit of the bargain his company was receiving, but asking questions like that would be so antithetical to what the company wanted out of the contract that it would amount to career suicide: "[T]hose type of question . . . you learn in your career that they're career stoppers. So, I wasn't gonna go and ask a manager why we were selling that much." DE:620:208-209.

Questell's testimony further illustrated the fundamental deficiencies in the conspiracy Count and Alcon Counts when he was asked point blank whether Tropical in 2012 (when the business relationship was formed) was prohibited in writing from selling product outside the territory of Suriname. He replied: "Not that I'm aware of." DE:620:212. No restriction existed at the time the business relationship was formed. The first restriction was formed in an April 2014 agreement with Alcon, and the Government failed to prove it was in any way material, particularly in light of the testimony that revealed the company's main focus was profit margins and that the needs of Suriname were indeed being fulfilled.

Counts 1, 8, and 9, relating to the business relationship with Alcon, must be vacated. The company was happy with the volume purchased under the contract; if the needs of the Suriname market could have been satisfied with fewer purchases,

*the company did not want to know*. Where a company is willing to turn a blind eye to empirical data that shows the purchase orders are in excess of what the intended market can consume, the Government cannot turn around and claim that resale restrictions are material to that same business arrangement.

D. The Government failed to prove an applicable contractual clause with respect to Domino, much less a material one

Count 1 and Count 5 must be vacated because the Government failed to prove any applicable final destination restriction with respect to Domino, much less a material one. The Government failed to offer substantial evidence that there even *was* a restriction in the Domino contract; its attempt to paper over the plain language of and ambiguity in the contract with witness testimony interpreting the contract fell far short of meeting the Government's burden of proof beyond a reasonable doubt.

The contract incorporated "terms and conditions" purportedly located at www.asr-group.com. The Government *never introduced what those terms and conditions were*; never introduced where they appear on the main page of ASR Group (Domino's) website; and never introduced whether they include any restrictions or speak to the matter of final destination of products. Instead, the Government asked witness Wester to opine on his "general" familiarity with the terms and conditions but never introduced the actual terms.

Proof of guilt must be specific and cannot be general. Terms in a contract—and their materiality—cannot be established by a witness from the company reciting

his "general" knowledge of what those terms contain. This testimony was not established to be based on Wester's actual review of any specific terms, nor did he reference any specific terms. Instead, he testified only to his "personal experience," which he described as understanding that the product won't be sold outside of the agreed-upon territory. But the Government never proved that this was in fact a term.

The evidence introduced was far too vague to establish that any such term even existed in the contracts. This failure of proof was worsened by the Government's asking the witness to opine about statements made to defendants orally in various meetings—which apparently contradicted the absence of any such language in the contract. The Government cannot amend a contract via witness testimony and then deem such amendments material to the contract. As to the Domino evidence, the Government failed to prove that there was any misrepresentation made in the contract. It failed to prove that any such misrepresentation was material. It failed to prove that the agreement between Domino and Appellants Doekhie and Nabi even spoke to the question of what could be done with product if the needs of the Suriname market could be met with smaller quantities than that purchased under the contracts.

## II. The district court denied Appellants a fair determination of materiality by instructing the jury, and permitting the Government to argue, that the manufacturers' conduct was irrelevant, and by restricting the defense from making arguments related to company conduct in closing.

Materiality is assessed by "look[ing] to the effect on the likely or actual behavior of the recipient of the alleged misrepresentation." *Escobar*, 579 U.S. at 193. Where the recipient "pays a particular claim in full despite its actual knowledge that certain requirements were violated, that is very strong evidence that those requirements are not material." *Id*. at 195. "A party's actions may reveal that a contract term is not material even if the contract's language would suggest otherwise." *Kousisis*, 605 U.S. at 139. *See also* Part I, *supra* (discussing "demanding" materiality standard).

That was precisely the evidentiary theory the defense pursued below. Long before closing argument, the district court recognized that company conduct after notice of diversion could support a permissible inference about the parties' original understanding and ruled that such evidence was "plainly admissible" for that purpose. DE:614:25-26. The defense thereafter developed that evidence, expressly raised "the issue of materiality of a representation" at the charge conference, DE:621:129, and attempted in closing to argue that the manufacturers' contemporaneous actions revealed what actually mattered to them. DE:621:270. Thus, the problem is not that Appellants now seek to give previously irrelevant

evidence a new appellate significance. The problem is that evidence the defense repeatedly identified as probative of the parties' bargains—and which the district court itself had recognized as relevant—was ultimately swept into a much broader admonition that the jury should disregard the manufacturers' conduct.

The district court's instructions had the effect of watering down proof as to materiality. The jury was instructed that evidence the companies "could have done something to prevent any fraud" or that "their procedures were somehow deficient should not be considered by you as an excuse or defense." DE:337:14. The jury was further instructed that it is no defense that a manufacturer "should have stopped the fraud after it allegedly discovered it," and that "[e]ven if the victim later embraced the scheme," the scheme still survives.

The problem with these instructions is that the jury was never instructed that it could consider such conduct in determining materiality. Materiality is a mixed question of law and fact that must be decided by the jury. *United States v. Gaudin*, 515 U.S. 506, 511-12 (1995). Much of the evidence that the district court instructed jurors to disregard entirely was properly before the jury and highly probative of the absence of materiality of any purported misrepresentation. The companies' continuing to allow diversion after learning it was occurring demonstrates that any contractual restrictions on diversion were not material. The district court's giving specific instructions that evidence tending to show the lack of materiality is not a

defense had the effect of directing a verdict by undermining—indeed, instructing jurors to disregard—a core theory of defense as to materiality. The separate instruction to the jury related to materiality did not cure this defect in the offense-specific charge. *See Francis v. Franklin*, 471 U.S. 307, 319-20 (1985) (rejecting State's argument that general instructions cured the defective instruction because "[t]hese general instructions as to the prosecution's burden and the defendant's presumption of innocence do not dissipate the error in the challenged portion of the instructions").

The error is especially apparent when the final instructions are compared with the district court's own evidentiary ruling during trial. Earlier, the court correctly recognized that contemporaneous company conduct could be circumstantial evidence of the parties' original understanding. The Government was permitted to rely on conduct occurring later in the relationship as circumstantial evidence that Appellants intended to deceive "from the outset." DE:614:24. The court expressly held that the principle ran both ways: "So, too, the defense should be able to show" later company conduct bearing on what the company knew and understood earlier. DE:614:25. The court distinguished an impermissible ratification theory from the permissible inference that a company's later conduct could show that the alleged restriction was not new to it or was consistent with the parties' prior understanding.

DE:614:25-26. The court concluded that such evidence was "plainly admissible." DE:614:25.

That ruling exposes the problem with what the jury was ultimately told. Evidence does not cease to bear on the parties' original understanding or on materiality simply because it cannot establish "ratification" as an affirmative defense. Yet the jury was told that it did not matter whether the companies should have discovered the fraud or later continued the relationship, and the prosecutor converted that limited proposition into the sweeping assertion that "none of that is relevant to the charges in the indictment." DE:621:194. The distinction the court had correctly drawn during trial disappeared.

And then, when the defense attempted to make precisely the inference the court earlier had recognized as legitimate—asking the jury to look at "what these companies did at the time they supposedly learned about diversion"—the Government objected to "victim blaming," and the court sustained the objection. DE:621:270. The result was not simply an imperfect instruction in isolation. The instruction, the Government's emphatic gloss on it, and the restriction of the defense summation all pointed the jury in the same direction: do not consider the manufacturers' conduct. But after *Kousisis*, the recipient's "actual behavior" is part of the materiality inquiry. 605 U.S. at 131. Appellants were therefore prevented from

effectively arguing the very evidence that bore most directly on the element the Government was required to prove.

The Government in closing argument *emphasized* the district court's special instruction related to company conduct, telling the jury: "any evidence or argument that the companies could have done something to prevent a fraud, or any evidence that they should have been better, they should have had procedures to stop this kind of activity from occurring, that is not to be considered when you're looking at whether these defendants committed wire fraud. If you think these companies should have known better, or had better procedures, or uncovered what the defendants were doing earlier, again, ***none of that is relevant to the charges in the indictment***." DE:621:194 (emphasis added). The Government therefore *expanded* the district court's instruction, and mis-instructed the jury as to the law. Company conduct is relevant to the materiality determination, and the Government told the jury it was *not relevant at all*.

The prejudice from this error was worsened by the fact that in closing the defense was precluded from making arguments related to company conduct (a legitimate consideration for the jury in determining materiality under Supreme Court precedent). Defense counsel was making arguments directly related to materiality:

> DEFENSE: "What tells you what those witnesses, and the companies that they represent, what they're really thinking is not what they say when they are prepped for their testimony . . . What tells you what they're really thinking is what they do, or what they did at the time.

> What did these companies do at the time they supposedly learned about diversion? What did they do then? Did they call the authorities? No. Did they even sue for breach of contract? No . . . But the fact that these companies did not think that this was a crime, that they were victims, or that there was even a basis for a civil lawsuit, you know what that is—"
>
> GOVERNMENT: Objection. Objection. Victim Blaming.
>
> COURT: Sustained.

DE:621:270. Defense counsel was making an argument expressly relevant to materiality under *Escobar*, and the district court sustained the objection. Arguments about victim behavior are permitted where the Supreme Court has said victim behavior is directly probative of an essential element. The district court's instructions, the Government's closing argument, and the narrowing of the defense closing had the combined effect of depriving Appellants of a fair determination by the jury on the materiality inquiry—a "demanding . . . requirement" which "substantially narrows the universe of actionable misrepresentations." *Kousisis*, 605 U.S. at 135. This deprived them of a fair trial, and of a jury finding that fairly determined whether the Government met its burden of proof with respect to the rigorous materiality requirement. The jury was instructed to ignore, and the defense was prohibited from arguing, probative exculpatory evidence related to materiality. The combined message to the jury from the district court's instruction, the Government's closing, and the sustained objection during the defense summation was clear: company conduct is not properly before you. That is at odds with Supreme

Court case law related to materiality and warrants vacatur of the fraud and § 670 convictions.

## III. Counts 2, 5, 8, and 9 must be vacated because the charged transmissions were not in furtherance of any fraud scheme but instead occurred after the relevant sales or after discovery of the alleged diversion.

The substantive fraud Counts were as follows:

| Count | Date | Sender and Recipient(s) | Alleged Transmission | Company |
|---|---|---|---|---|
| 2 | Feb. 13, 2017 | Nabi → Grobman and Doekhie | Email transmission regarding “the loss of Victim Company Four's business following the company's discovery of the defendants’ fraudulent scheme” | Eden |
| 5 | Aug. 11, 2017 | Nabi → Torres and Doekhie | Email transmission regarding “how to address a Victim Company Three's discovery of the defendants' fraudulent scheme” | Domino/ASR |
| 8 | Mar. 23, 2018 | Grobman → Nabi and Doekhie | Email transmission regarding “taking labels off Victim Company Two's products” | Alcon |
| 9 | Mar. 23, 2018 | Grobman → Nabi and Doekhie | Email transmission regarding “shipment of products to Suriname after Victim Company Two intended to travel to Suriname to investigate the defendants’ fraudulent scheme” | Alcon |

Independent of the deficiencies of proof as to materiality discussed above, the indictment failed to sufficiently charge, and the Government failed to introduce sufficient proof to sustain, four of the substantive fraud Counts. The wires charged in these Counts were not transmitted in furtherance of any fraud scheme.

The elements of wire fraud are (1) the intentional participation in a scheme to defraud; and (2) the use of the interstate wires *in furtherance of that scheme*. *United States v. Ross*, 131 F.3d 970, 984 (11th Cir. 1997). The "scheme" alleged in Counts 2 through 9 was for "the defendants and their accomplices to unjustly enrich themselves by obtaining FDA-regulated consumer goods, drugs, and medical products at deeply discounted prices from the Victim Companies by falsely and fraudulently representing to the Victim Companies that the products were for distribution and use outside of the United States (i.e. 'for export only'), when, in fact, the defendants from the outset, intended to, and did, sell those goods, drugs, and medical products at a substantial profit to wholesalers, distributors, and others in the United States." DE:132:9.

Several of the substantive Counts charged wire transfers that did not further this alleged "scheme" (which itself was legally defective, *see supra*), and which were committed after the alleged "scheme" had reached "fruition." *See Kann v. United States*, 323 U.S. 88, 94 (1944) (holding that where individuals set up a scheme to fraudulently obtain checks, which were then cashed or deposited and subsequently mailed to the bank, the fraud was completed when the checks were cashed or deposited: "The scheme in each case had reached fruition. The persons intended to receive the money had received it irrevocably"). The statute makes it unlawful to devise a scheme to defraud and to use a wire *for the purpose of executing* such a

scheme. 18 U.S.C. § 1343. That means generally that the wire must be sent "*prior* to the scheme's completion." *United States v. Lane*, 474 U.S. 438, 453 (1986) (emphasis in original). To determine whether a wire was sent before or after the scheme's completion requires establishing when the scheme "as conceived by the perpetrator at the time" ended. *Schmuck v. United States*, 489 U.S. 705, 715 (1989). *See also United States v. Redcorn*, 528 F.3d 727, 739 (10th Cir. 2008) (explaining that "at some point the fraudulent scheme must be complete" and that occurs when funds are available for defendants' personal use; later use of stolen funds could not further scheme); *United States v. Christo*, 129 F.3d 578, 580 (11th Cir. 1997) ("The execution is completed by the movement of money, funds, or other assets from the financial institution"). *Cf. Grunewald v. United States*, 353 U.S. 391, 401-02 (1957) (declining to infer a subsidiary conspiracy to conceal from mere acts of concealment after the conspiracy's central objectives had been attained because doing so would "extend the life of a conspiracy indefinitely").

*Schmuck* does not convert every communication connected to an alleged fraud into a substantive wire-fraud offense. A post-transaction communication may qualify when it is incident to an essential part of an ongoing scheme—for example, when it lulls the victim so that the perpetrator can retain the proceeds or continue obtaining property. But the Government still must establish a functional nexus between the charged wire and execution of the scheme "as conceived by the

perpetrator." *Schmuck*, 489 U.S. at 715. A communication that merely reports discovery of the alleged scheme, discusses its consequences, or terminates future purchases does not satisfy that requirement.

That is important because the scheme charged here had a specific object: obtaining products from the manufacturers at discounted export prices. DE:132:9. Once a particular sale had been completed—and especially once a manufacturer had discovered the alleged diversion and further discounted purchases had ended or were being abandoned—an internal communication about the fallout could not execute that object. Otherwise, § 1343 would sweep in virtually every email among alleged participants discussing a completed fraud, including communications memorializing its discovery or failure.

Count 8 illustrates the point. Nabi wrote that "[g]oing back to Alcon after all the allegations is impossible now," and Grobman responded: "If you cannot go back to Alcon, don't buy these products again ever." DE:618:310-311. The Government may regard the remainder of the email concerning removal of the "institutional" marking as evidence of consciousness of guilt or concealment. But the wire Congress criminalized is one used to execute the scheme to obtain property. A communication expressly directing the participants not to purchase any more Alcon product cannot rationally be said to execute a scheme whose object was obtaining more Alcon product at a discount.

Count 9, an email sent the same day and concerning a shipment of goods to Suriname in response to Alcon's investigation, suffers from the same defects. By then the alleged diversion had been discovered, the participants were discussing how to respond to that discovery, and the contemporaneous Count 8 communication described further purchases from Alcon as "impossible" and directed that the products never be purchased again. A shipment of goods to Suriname undertaken to answer an investigation into past transactions may be evidence of attempted concealment. But absent evidence that the shipment was designed to induce another discounted sale or otherwise obtain additional property from Alcon, it was not a wire used to execute the property-obtaining scheme charged in the indictment.

Several of the substantive fraud Counts must be vacated for the following reasons:

Count 2: An email between defendants regarding loss of a victim company's business following the company's alleged discovery of a fraud scheme is not a wire transmission for the purpose of *executing* a fraud scheme. This reasoning is circular and converts wire fraud into an obstruction statute. The Government cannot sustain a substantive Count simply by alleging that each email between co-defendants about an alleged fraud scheme is *itself an execution of that fraud scheme*. The entirety of the Government's evidence on Count 2 was a charged wire that read "Johnny, pls check. Do you know these people? They will not enter into business with us due to

diversion issues brought up by vendors." DE:618:262. The Government failed to establish this was "for the purpose of executing such scheme or artifice." It post-dates by one month Eden's last fulfilled order and simply reported loss of business. DE:612:100 (Hughes testimony stating that last purchase order was January 11, 2017). Additionally, this is Grobman's only Eden-related conviction: receipt of an email stating that other parties "will not enter into business with us due to diversion issues brought up by vendors." This fails to satisfy the advance knowledge and purpose requirements of aiding and abetting, much less the requirements for criminal fraud. More broadly, and as to all defendants, the internal report of failure charged in Count 2 is not a transmission in furtherance of a fraud scheme.

Count 5: Nabi's sharing with others a communication with Domino, by simply forwarding a communication from the company, is not a transmission in furtherance of a fraud scheme. The Government cannot render a wire transmission in furtherance of a fraud scheme simply because one defendant has shared with her business associates a communication from a purported victim company. Indeed, the Government appeared to focus more heavily on cooperator Torres's reply to this email, that, "we are caught with our hands in a cookie jar." DE:617:135. But a cooperator's own potentially inculpatory response to the sharing of an email does not render the act of sharing an act done in furtherance of any fraud scheme—

particularly where the relationship with the purported victim company, Domino, was at that point functionally defunct.

Count 8: Count 8 charges an email from Grobman to Doekhie and Nabi: "If you cannot go back to Alcon, don't buy these products again ever. Let's see first if we can clean with acetone without damaging the units." DE:618:311. Grobman's stating "don't buy these products again ever" does not further a scheme to deprive money or property from Alcon.

Count 9: Count 9 is part of the same email chain as Count 8. It relates to Grobman's agreeing to Doekhie's request to send cases of Alcon product to Suriname in preparation for an Alcon visit. Exh. 9A. The prior email charged in Count 8 had already announced a termination of a business relationship with Alcon. Count 9 *followed* that decision and relates at best to after-the-fact concealment that cannot be deemed part of the fraud scheme.

Purported acts of concealment are insufficient to form the basis for a wire transmission because such acts follow the completion of any alleged fraud scheme. *Cf. Grunewald*, 353 U.S. at 401-06 (acts of concealment that follow the offense cannot extend the limitations period); *United States v. Kilkenny*, 493 F.3d 122, 130 (2d Cir. 2007) (citing *Grunewald* and holding defendant's bank fraud scheme was "executed no later than when he received the funds from his fraudulent loan application"). The Government cannot substitute purported consciousness-of-guilt

evidence for proof of the essential transmission *in furtherance* of the scheme; so-called consciousness of guilt evidence follows the completion of the alleged scheme.

Because Counts 2, 5, 8, and 9 were not in furtherance of any fraud scheme but rather at best reflected conduct that follows the completion of the alleged scheme, these Counts must be vacated.

## IV. The pre-retail theft convictions must be vacated where the manufacturers voluntarily transferred the infant formula for the full agreed-upon purchase price and the Government proved, at most, misrepresentations affecting the price of otherwise voluntary sales rather than that Appellants "obtained" the medical products themselves "by fraud or deception."

The Government's evidence related to a conspiracy to violate the federal statute prohibiting theft of pre-retail medical goods failed across the board as to each element of the offense.

First, the Government failed to prove that the goods at issue were within the special framework and failed to obtain a special verdict identifying the products as to which the jury verdict related. Second, the Government failed to prove that at the time the goods were physically obtained, they were pre-retail in nature. Third, the Government failed to prove that the goods were "obtained" by "fraud or deception" within the meaning of the theft statute.

Although the term fraud is used in 18 U.S.C. § 670, the meaning that the Government sought to give that concept was inconsistent with, and far exceeded, the theft category of offense established by the statute and relevant legislative history.

As the Supreme Court has explained in addressing theft by deceptive means, the actionable component of the offense relates to the use of deception in the actual physical turnover of the property, such as where a person who impersonates the actual consignee and drives off with the goods. The statute is not meant to apply where the designated consignee receives the goods as intended by the seller. The actual obtaining of the goods is the core focus of the fraud-or-deception referred to in the statute. In *Dubin v. United States*, 599 U.S. 110 (2023), the Supreme Court explained the importance given to the core meaning of a statute dealing with fraud, including giving meaning to the title of the statute in evaluating a Government effort to go beyond the ordinary limits of the matter the statute addresses. In *Dubin*, the Court focused on the aggravated identity theft title of the statute to limit its application to cases in which the fraud relates directly to the misuse of an identity to defraud. Similarly here, the theft concepts identified in the statute are all consistent with traditional notions of theft, which includes deception that goes to the actual transfer of possession of the goods, rather than expansively interpreting the statute to be a mirror image of the wire fraud statute. Additionally, adopting the Government's interpretation would not only create constitutional concerns of vagueness, but also present double jeopardy issues not at all contemplated by Congress in creating a theft statute.

The "by fraud" prong on which the jury was instructed, *see supra*, required that the deception "did deceive such person and influence his action to his damage." DE:621:163. The Government failed to prove economic damage as to the Mead Johnson conduct that formed the basis for the § 670 charges. Mead Johnson set the prices. The prices were paid in full. The only evidence related to Mead Johnson's damages focused on "potential loss," *see supra*, which is too speculative to provide substantial evidence of guilt sufficient to sustain the verdict on the § 670 Counts.

The "by deception" prong on which the jury was instructed required a *material* statement—which, as discussed above, the Government failed to prove with respect to Mead Johnson, for the same reasons discussed in Part I, *supra*. Particularly as to the dates charged in Counts 26 through 29, the record evidence showed that the company was always aware of diversion and yet continued to ship. Counts 21 through 25 are similarly defective and warrant vacatur because, as discussed *supra*, the Government failed to prove that any misrepresentation made to Mead Johnson was material where the product was in fact being shipped to and distributed in Suriname, and there was no evidence that the needs of the Suriname market were not being met.

### V. The smuggling convictions under 18 U.S.C. § 554 must be vacated where the goods were lawful to export, the charged export information was accurate when submitted by third parties, and the Government's theory depended on later conduct retroactively transforming truthful Automated Export System filings into knowingly false or misleading export information.

The Government also failed to prove the smuggling charges in Counts 30 and 31. Specifically, the Government failed to prove that the items exported from the United States were in any way unlawful or that their exportation was subject to limitations, such as would be the case for products outside the permissible range of exportable items. The Government's theory was that the lawful preparation by the manufacturers of a valid export document made the exportation of lawfully-exportable goods unlawful because later actions unlinked to the export document deviated from the information on the document. The Government's theory that this somehow converted the exportation of such goods into an illegal act under the statute is unsupported by the plain language of the statute and relevant precedent. Rather, although there may have been some basis to charge the defendants with a different statute, such as failure to file a required export form, the Government did not proceed on that theory and did not charge a violation of that statute. Instead, the Government specifically waived its right to proceed on such a violation.

The smuggling Counts, which charge violations of 18 U.S.C. § 554, require as one element the exportation or concealment of exportation of any merchandise, article, or object that is "***contrary to any law or regulation of the United States***." 18

U.S.C. § 554 (emphasis added). The statute thus targets exportation that is inherently unlawful. The *object* of exportation here was *not* unlawful, as the district court's instruction told the jury: "Certain documents admitted as evidence in this case contain language stating that certain products were exported from the United States in accordance with the Export Administration Regulations, and that 'diversion contrary to U.S. law is prohibited.' This language relates to regulations concerning the export of items that could threaten national security. ***These regulations do not apply to the products at issue in this case***." DE:621:167-68 (emphasis added). Particularly given the contrary-to-law requirement contained in the smuggling Counts, the district court's declining to give a defense instruction regarding the lawfulness of diversion here was that much more problematic, especially because the defense was not permitted to elicit testimony about the lawfulness of diversion. The defense thus could not adequately defend, and the jury was not properly instructed, as to an essential element of the offense.

The only predicate charged was 15 C.F.R. § 30.71, which punishes any person who "knowingly fails to file or knowingly submits, directly or indirectly, to the U.S. Government, false or misleading export information through the AES." The proof at trial showed that the AES filings for the charged shipments were made by freight agents of the purported victim companies, not by any of the Appellants nor by the Government's cooperator Torres. The information was accurate at the time it was

submitted: the containers then held what the filings disclosed; swaps for sheetrock did not occur until after. The submission was thus true at the time. The plain text of the regulation makes clear that the person violating must be the filer. The filer thus must know the information to be false (which here it was not) at the time of filing.

The district court recognized an "allure" to Appellants' reading. DE:620:324. The rule of lenity here compels Appellants' reading: Under a "long line" of Supreme Court decisions, "the tie must go to the defendant." *United States v. Santos*, 553 U.S. 507, 514 (2008). "The rule of lenity requires ambiguous criminal laws to be interpreted in favor of the defendants subjected to them." *Id*. *See also United States v. Bass*, 404 U.S. 336, 348 (1971) (making clear that fair warning and separation of powers principles underlie the rule of lenity; people should not "languish[ ] in prison unless the lawmaker has clearly said they should"); *Liparota v. United States*, 471 U.S. 419, 427 (1985) (given the "paucity of material suggesting that Congress did so intend, we are reluctant to adopt such a sweeping interpretation"). This is a prosecution based on conduct of non-filers; the underlying filings were made by people who (1) are the ones the regulation reaches; and (2) submitted filings that were true when made. There is at the very least grievous ambiguity as to whether the statute was supposed to reach this far; this warrants vacatur of the conviction under the rule of lenity.

Where the charged crime is exporting "contrary to" a specific regulation, and that regulation itself criminalizes knowing conduct, the Government must prove the regulatory scienter; a contrary rule waters down too much the knowing-falsity regulation, which must be read in conjunction with the statute. *Cf. Rehaif v. United States*, 588 U.S. 225, 229-32 (2019) (scienter applies to each element that criminalizes otherwise innocent conduct). The district court distinguished *Rehaif* as involving elements in one statute, but where the statute expressly incorporates the regulation, it too supplies essential elements.

This Court in *United States v. Izurieta*, 710 F.3d 1176, 1181-82 (11th Cir. 2013), found similar "contrary to law" language in 18 U.S.C. § 545 to be construed narrowly, noting that "lenity remains an important concern in criminal cases, especially where a regulation giving rise to what would appear to be civil remedies is said to be converted into a criminal law." DE:615:97-98. The same result is compelled here: the statute does not provide for the expansive reading adopted by the district court.

## VI. The money laundering convictions must be vacated because the Government failed to prove criminally derived proceeds.

The money laundering convictions must be vacated where the Government failed to prove that the transactions consisted of fraud proceeds or smuggling proceeds. The proceeds were not unlawfully obtained; accordingly, the money laundering Counts must be vacated.

The alternative-predicate theory requires more precision than the Government's general verdict permits. The jury was permitted to treat wire fraud or smuggling as the specified unlawful activity. If one predicate theory is merely unsupported by sufficient evidence, then *Griffin*, 502 U.S. at 56-60, ordinarily permits a general verdict to stand where another legally valid theory is adequately supported. But where one submitted basis is legally invalid—because the conduct does not fall within the statute at all—*Yates* applies, and the Court cannot simply presume that the jury selected the valid alternative. *See Yates v. United States*, 354 U.S. 298, 312 (1957).

Accordingly, if this Court agrees that the jury was permitted to convict under a legally erroneous understanding of wire fraud or § 554, the derivative § 1957 convictions must be examined under the legal-error rule rather than saved merely because another predicate was also presented. The Government bears the applicable harmless-error burden; the general verdict provides no way to know which specified unlawful activity the jury selected.

There is an independent evidentiary problem as well. Section 1957 required the Government to connect each charged monetary transaction to property "derived from" specified unlawful activity. The district court itself recognized the importance of that nexus when it granted a judgment of acquittal on Count 11. The Government attempted to connect a 2015 monetary transaction to criminal proceeds through an

email from approximately two years later, and the court held that it was "too much a stretch" for a reasonable jury to find that the 2015 transaction involved illegally derived proceeds on that basis. DE:620:269-270. The same tracing requirement applies to every remaining § 1957 Count. The fact that money moved among entities participating in legitimate product purchases and sales does not establish that the particular funds involved in a charged transaction were criminally derived.

The Government also failed to show that any product from which proceeds were at issue in these Counts was derived from the completed fraud transactions involving sales of goods that were distributed in the continental United States. Given the insufficient diversion proceeds analysis, the Government's money laundering allegations fail. Both of these errors warrant reversal.

## VII. The district court erred at sentencing, warranting reversal and remand.

### A. The district court erred in calculating loss for purposes of sentencing.

The district court erred in its imposition of sentencing guideline enhancements. The district court imposed a staggering 24-level enhancement for loss based primarily on speculation that purported victim companies who profited from their business transactions with the Appellants could have theoretically made more money from hypothetical sales. Even if the Government's theory—that the vendors were misled regarding Appellants' intention to resell goods in a domestic

market—is accepted, there was no basis for the district court's finding that vendors suffered any *loss*, that is, economic harm. The vendors received full payment at the agreed-upon price and made a profit on each sale. Moreover, the products were actually distributed in Suriname. The district court's basis for finding loss was that "[w]e have a delta, a substantial delta, between the full retail price and the discounted price," DE:623:153; it deemed this to be a "reasonable estimate." *Id*.

Where loss is disputed, a court cannot simply agree with the Government's loss claim but rather is "required to make factual findings sufficient to support the Government's claim that the amount of fraud loss attributed to [the defendant] was that which was contained in the PSI." *United States v. Liss*, 265 F.3d 1220, 1231 (11th Cir. 2001). Factual causation for loss, for sentencing purposes, requires proof of reliance ("but for" causation) and also legal (i.e., direct) causation. *United States v. Robertson*, 493 F.3d 1322, 1334 (11th Cir. 2007) ("[T]he Government must show not only that a particular loss would not have occurred but for the conduct underlying the offense of conviction, but also that the causal connection between the conduct and the loss is not too attenuated (either factually or temporally)") (quotation omitted).

In *United States v. Javat*, 2026 WL 1224100 (11th Cir. May 5, 2026), the appeal of the parallel diversion prosecution on which the Government and district court relied, a panel of this Court held in an unpublished opinion that lost profits

from a fraudulently obtained discount may serve as guideline loss only "where the evidence shows that the lost profits represent the pecuniary harm to the victim." *Id*. at *15. Even should this Court choose to adopt the reasoning in that unpublished opinion, the proof here failed to show any pecuniary harm to the purported victim companies who in some instances continued to distribute to Appellants even after learning of potential diversion. Here, any proof of actual harm to the victim companies is missing from the record; to the extent that any speculation as to harm exists, it is too speculative to sustain the finding of loss even under a preponderance-of-the-evidence standard. The premise that the companies would have made the same sales in terms of quantity domestically at full retail price was never proven and is refuted by logic: the companies would surely have sought to make such domestic sales, thereby earning a greater profit, had that been the case.

*Javat* illustrates the evidentiary showing that is missing here. The panel did not hold that the difference between two price lists automatically constitutes guideline loss whenever a purchaser obtains an export discount through fraud. It held that lost profits may constitute loss "where the evidence shows that the lost profits represent the pecuniary harm to the victim." *Javat*, 2026 WL 1224100, at *15. The record there included manufacturer-specific evidence supporting both the fraudulently obtained discounts and the manufacturers' claimed financial harm.

Here, by contrast, the Government never supplied the evidentiary bridge between the "delta" in domestic and export prices and actual pecuniary harm. It did not identify domestic purchasers who would have bought the same quantities at the higher price; did not establish that the manufacturers could or would have sold the same volume domestically; and did not establish net profits displaced by Appellants' purchases. The evidence instead established that the manufacturers chose the export prices, received those prices in full, and profited from the sales. A price differential may establish that two markets were priced differently. It does not establish that every dollar of that differential would have been earned but for the offense.

The Guidelines require an estimate of loss, not an estimate of the highest conceivable alternative revenue. A district court may draw reasonable inferences from evidence, but it may not replace the factual question—what pecuniary harm did the offense actually cause?—with the assumption that every unit sold for export would otherwise have been sold domestically, in the same quantity, at the higher price. On this record, that speculative hypothetical was never established by a preponderance of the evidence.

To the extent that *Javat* holds that the full-retail differential is loss without record proof of displaced sales, this rule misreads U.S.S.G. § 2B1.1 and should not be adopted by this Court. But *Javat* need not be read so broadly: here, there was insufficient proof and only speculation as to the loss figure. The displaced-sales

premise is unsupported on this record. Even if loss is more than zero, the $65 million figure applied by the district court is unsupported by the record. While a district court may make reasonable estimates as to loss, such estimates must be reliable and cannot be speculative.

**B.** <u>The district court's *Keene* finding was invalid, rendering sentencing error not harmless.</u>

Even assuming the district court adequately stated that it would impose the same sentence if its Guidelines rulings were reversed, that resolves only the first half of the *Keene* inquiry. The Eleventh Circuit's recent published decision in *United States v. Morilla* confirms that an assumed-error harmlessness analysis has two distinct requirements: "(1) the district court states it would have imposed the same sentence, even absent an alleged error, and (2) the sentence is substantively reasonable." 177 F.4th 1291, 1300 (11th Cir. 2026) (quoting *United States v. Goldman*, 953 F.3d 1213, 1221 (11th Cir. 2020)). In conducting the second inquiry, this Court must assume the Guidelines issue was decided in the defendant's favor, reduce the range accordingly, and determine whether the sentence remains substantively reasonable under that range. *Id.*; *Keene*, 470 F.3d at 1349–50. That second requirement is dispositive here. The district court arrived at a total offense level of 39 and Criminal History Category I, producing a range of 262 to 327 months, only after adding 24 levels for purported loss. If that 24-level enhancement is removed, the resulting total offense level is 15. At Criminal History Category I, the

2018 Sentencing Table provides a range of 18 to 24 months. The imposed sentence of 220 months would therefore stand 196 months above the top of the assumed correct range—more than nine times that upper limit.

A variance of that magnitude cannot be rendered reasonable by the bare statement that the court would impose the same sentence anyway. The Guidelines are advisory, but they remain the "starting point and the initial benchmark" for federal sentencing. *Gall v. United States*, 552 U.S. 38, 49 (2007). And *Morilla* requires this Court to assess reasonableness from the assumed correct range, not from the erroneous one. The difference here is not a marginal two-level dispute. Loss supplied twenty-four offense levels and transformed a range measured in roughly two years into one measured in decades.

Nor did the district court explain why the § 3553(a) factors would warrant a 220-month sentence if the principal quantitative measure of the offense's economic seriousness—the $65-million-plus loss finding—were removed. Appellants were Criminal History Category I offenders; the manufacturers received the prices they themselves charged; and the disputed loss consisted not of unpaid invoices or money taken from the manufacturers' possession, but of hypothetical additional profits from alternative transactions. Whatever sentence the court might impose after a correct Guidelines calculation, the existing record does not justify treating a sentence more

than nine times the upper end of the assumed correct range as harmlessly interchangeable with the sentence produced by a 24-level loss enhancement.

*Keene* was designed to avoid pointless remands where a Guidelines dispute truly made no difference to a reasonable sentence. It was not designed to make the Guidelines irrelevant. Where correcting the disputed enhancement changes the advisory range from 262–327 months to 18–24 months, and the sentencing court gave no explanation for a variance of nearly sixteen-and-a-half years above the corrected ceiling, the Government cannot carry its burden to show harmlessness.

### **C.** Based on the district court's errors in calculating loss, resentencing relief is warranted as to the restitution judgment.

The restitution judgment compounds the district court's error in calculating loss. In a stipulated and amended judgment, Appellants were ordered to pay $142,547,685 in restitution, jointly and severally, on a stipulated motion the parties agreed "mirror the loss calculation and the loss methodology" applied by the district court at sentencing. DE:597:2. Appellants expressly preserved their right to "challenge the loss calculation adopted by the Court and to likewise challenge the use of the loss calculation methodology as it is being employed in the determination of restitution." DE:597:2.

The mirrored methodology cannot support restitution for the reasons discussed above. The Mandatory Victims Restitution Act (MVRA) of 1996 compensates only a victim's actual loss caused by the offense. 18 U.S.C. § 3664(e).

The methodology relied upon by the district court in calculating loss for sentencing purposes was unduly speculative and focused on hypothetical margins. Restitution is not intended to provide a windfall. *United States v. Huff*, 609 F.3d 1240, 1249 (11th Cir. 2010). Absent proof, rather than speculation, of displaced sales, there is no actual loss. Resentencing relief is warranted.

## CONCLUSION

For the foregoing reasons, the convictions must be vacated; alternatively, the case should be remanded for resentencing.

Respectfully submitted,

/s/ Howard Srebnick
HOWARD SREBNICK, ESQ.
BLACK SREBNICK P.A.
201 S. Biscayne Blvd. Suite 1300
Miami, Florida 33131
Tel. No. (305) 371-6421
*Counsel for Appellant Doekhie*

/s/ David Oscar Markus
DAVID OSCAR MARKUS, ESQ.
MARKUS/MOSS PLLC
40 N.W. 3rd Street, PH1
Miami, Florida 33128
Tel. No. (305) 379-6667
*Counsel for Appellant Grobman*

/s/ Richard C. Klugh
RICHARD C. KLUGH, ESQ.
RICHARD C. KLUGH, P.A.
40 NW Third Street, PH 1
Miami, Florida 33128
Tel. No. (305) 536-1191
*Counsel for Appellant Nabi*

## CERTIFICATE OF COMPLIANCE

I CERTIFY that this brief complies with the type-volume limitation of FED. R. APP. P. 32(a)(7). According to the WordPerfect program on which it is written, the numbered pages of this brief contain 18,060 words.

By: /s/ David Oscar Markus
David Oscar Markus

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that the foregoing was electronically filed on this 2nd day of October 2026 and served on that date by ECF filing upon all counsel of record.

By: /s/ David Oscar Markus
David Oscar Markus